UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
YVONNE L. TINES JONES,              )
                                    )
        Plaintiff,                  )
                                    )
            v.                      )
                                    )          Civil Action No.
NORMAN Y. MINETA,                   )          05-10082-EFH
Secretary,                          )
U.S. DEPARTMENT OF                  )
TRANSPORTATION,                     )
                                    )
        Defendant.                  )
_____)

## THE DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF FACTS

The defendant, Norman Y. Mineta, Secretary of the Department of Transportation (the "DOT"), submits his Local Rule 56.1 Statement of Facts.

1.    Tines Jones has worked for the DOT in some capacity since 1989, specifically for the Federal Aviation Administration ("FAA").  She alleges that the first discriminatory act occurred in July, 1998, when she was denied her request for a temporary promotion by her manager, Ernest Landry ("Landry") (see Ex. 3).

2.    Tines Jones created an Individual Development Plan ("IDP"), which included a list of objectives for career development and training to advance knowledge and job responsibilities. (Ex. 1 and 2).

3.    The IDP was signed by both Tines Jones and Landry, and was "approved contingent upon available funding ... and based on the *needs of the organization* during the developmental time frame. Id (emphasis added).

4.    Tines Jones requested the promotion on June 24, 1998, and in another memorandum submitted to Landry on July 16, 1998 (see: Ex. 3).  The request was denied on July 22,

1998 due to impending "critical staffing shortages" (Ex. 4).  Nevertheless, the first

meeting Tines Jones had with an EEO Counselor was more than a year later (see. Ex. 12,

¶ 18, EEO Complaint dated July 26, 1999).

5.    Landry denied the promotion request articulating anticipated staffing shortages and

organizational needs as the reason for the denial.  He provided non-discriminatory

reasons in a correspondence to Tines Jones dated July 22, 1998 (see Ex. 4).  The request

for a temporary promotion came at a time when the personnel office was anticipating the

loss of two employees, one to maternity leave, and at a time when there was already a

vacancy in the area of work Tines Jones performed. Id.

6.    In a memorandum to Nason in October of 1998 related to another project, Tines Jones

addressed the recent denial of her request for the temporary promotion, stating that she

"can appreciate and understand the reason for the denial" (Ex. 6).

7.    In February of 1999, Tines Jones became aware of a conference that was going to be held

in June (Ex. 12, ¶¶ 13-16).  She asked if she could attend, and the request was denied.  Id.

Larry Piro ("Piro"), a white male employee who worked as a Personnel Management

Specialist, was the one person sent to the conference.  Id.

8.    The agency was financially limited to sending only one employee (Ex. 7).  Piro was sent

to the conference because he was working on the benefits issues related to those to be

raised at the conference, as was supported in the statements of three supervisors (see Ex.

8, 9 and 10).

9.    In September of 1999, a vacancy was posted for the position of Personnel Management

Specialist (Ex. 13).  Tines Jones was interviewed for the position by a panel of her

colleagues, and on March 16, 2000, Landry announced that he had decided not to fill the

position due to a reorganization of benefits issues (Ex. 15).

10.    Tines Jones expressed concern as to how the potential benefit changes would affect the

job vacancy (Ex. 25, p. 5).  Later that day, Landry informed both candidates that the

position would not be filled because of these potential benefit changes, and offered to

temporarily promote the candidates instead.  Id.  In addition to Landry, other employees

stated that they had heard discussion of the benefits changes, and that these changes had

the potential of affecting the job vacancy (Ex. 16 pp. 3-4; Ex. 17 p. 2; and Ex. 18 p. 3).

Also it was not uncommon for position vacancies to be cancelled or to go unfilled, as

evident by four other positions that went unfilled in the previous year (see: Ex. 14).

11.    Tines Jones and the FAA entered into an "Interim Settlement Agreement" on April 19,

2001, which provided certain measures to be taken, including a temporary promotion.

Tines Jones alleges that the FAA failed to comply with the agreement in numerous ways,

such as failing to relieve her of staffing assistant duties, failing to meet with her

consistently, and failing to train her consistent with her objectives. Pl. Comp. ¶ 29.

12.    Tines Jones filed two EEO complaints before the settlement agreement was created, one

in July of 1999, and the other in May of 2000 (Ex. 12, ¶¶ 18 and 24).

13.    When the EEO complaint was originally investigated, Tines Jones stated in her own

affidavit that she "[did] not know how this limits a major life activity" (Ex. 21).  In

January of 2003, Tines Jones requested that she be transferred to a Nashua, New

Hampshire office of the FAA as a reasonable accommodation for her impairment (Ex.

22).  In a letter dated January 15, 2003, Landry acknowledged her request and on January

31, 2003, asked that Tines Jones have her medical provider submit documentation about

how her mental impairment limited her work activities and interfered with her ability to

interact with others (Ex. 23).  On February 21, 2003, Dr. Blencowe sent a letter to Landry

responding to his "request for more information about the current impact [of Tines Jones'

symptoms] on her functioning" (Ex. 24).  The letter stated that Tines Jones was cleared to "return to work and perform all of her assigned duties." Id. On March 13, 2003, Landry sent a memorandum to Tines Jones denying her request for relocation based on the determination that she did not "have a work related disability and that reasonable accommodation [was therefore] not necessary" (Ex. 5).  Landry made this decision relying on Dr. Blencowe's assessment that Tines Jones was clear to return to work in full capacity. Id.  Tines Jones sent a letter requesting that she be relocated to New Hampshire "to execute [her] job responsibilities" (Ex. 22).

14.    The FAA submitted copies of all vacancies in Personnel positions from January 8, 2003 through October 22, 2003 (Ex. 14).  There were no available personnel positions in New Hampshire during that time period, which is the classification of jobs that Tines Jones would work within. Id.

15.    Beginning with a request in 1997 from Tines Jones for a new work space because Susan Nason "was constantly watching and looking into [her] workspace" (Ex. 26).

Respectfully submitted,

NORMAN Y. MINETA,
SECRETARY OF THE DEPARTMENT
OF TRANSPORTATION,

By his attorneys,

MICHAEL J. SULLIVAN
United States Attorney


/s/ Rayford A. Farquhar
Rayford A. Farquhar
Assistant U.S. Attorney
U.S. Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02465
(617) 748-3284

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 1, 2008.

/s/ Rayford A. Farquhar
Rayford A. Farquhar
Assistant U.S. Attorney

**Yvonne Tines Jones v. Norman Y. Mineta,**
**Secretary, U.S. Department of Transportation**
**C.A. No. 05-10082-EFH**
**Defendant's Local Rule 56.1 Exhibit List**

1. Tine Jones' Individual Development Plan dated July 22, 1998

2. Individual Development Plan/Temporary Promotional/Detail dated June 24, 1998

3. Ernest Landry Follow-up to Tines Jones IDP and Request for Temporary Promotion

4. Ernest Landry Denial of Promotion to Tines Jones dated July 22, 1998

5. Memorandum from Ernest Landry to Tines Jones dated March 13, 2003.

6. Tines Jones' Response to Denial of Promotion.

7. Email Announcing Larry Piro as Representative to the Benefits Conference.

8. Affidavit of Ernest Landry dated May 5, 2000.

9. Tines Jones Employee Training Report

10. Affidavit of Susan Nason dated May 8, 2000.

11. Affidavit of Gina Razel dated May 8, 2000.

12. Tines Jones U.S. District Court Complaint.

13. Department of Transportation Internal Vacancy Announcement - Personnel Management Specialist, FG-201-7/9/11, dated September 20, 1999.

14. List of Other FAA Positions not Filled.

15. Cancellation of the Employee Relations Specialist Position, FG-9/11.

16. Affidavit of Ernest Landry dated May 9, 2000.

17. Affidavit of Eileen M. Celli dated May 8, 2000.

18. Affidavit of Susan Nason dated May 9, 2000.

19. Letter from Elizabeth A. Blencowe, M.D. dated December 17, 2002.

20. Letter from Jessica M. Schwartz, LICSW dated June 12, 2003.

21. Tines Jones Affidavit

22. Memorandum from Tines Jones to Ernest Landry dated January 10, 2003.

23. Memorandum from Ernest Landry to Tines Jones re Reasonable Accommodation Request dated January 31, 2003.

24. Letter from Elizabeth A. Blencowe, M.D. dated February 21, 2003.

25. Affidavit of Tines Jones, DOT Complaint No. 1-00-1160 dated May 5, 2000.

26. Letter from Tines Jones to Ernest Landry dated November 17, 1997.

EXHIBIT 1

# INDIVIDUAL DEVELOPMENT PLAN

| 1. Employee's Name | 2. Current Position/Grade | 3. Organization |
|---|---|---|
| Yvonne L. Tines | Staffing Assistant (O/A) | Operations Branch<br>Human Resource Management Division |

| | 5. Long Range | |
|---|---|---|
| | Retirement Officer, FG-12 | |

## CAREER GOALS OR TARGET POSITIONS (INCLUDE GRADES)

| 4. Short Term |
|---|
| Employee Relations Specialist, FG-9/11 new position developed by the HRM Design Team |

| 6. Developmental Objectives | 7. Developmental Assignments<br>Cite best info available | Tentative Dates | 8. Formal Training<br>Cite best info available | Tentative Dates |
|---|---|---|---|---|
| Knowledge of Federal and agency personnel programs, regulations and procedures | Detail in Labor Relations with Retirement Officer | TBD | Facilitator Course | TBD |
| Ability to communicate orally and in writing | Detail in Labor Relations working with OWCP | TBD | FERS Retirement Course | TBD |
| Ability to gather, analyze, and evaluate information to make recommendations and/or decisions | Review of written documentation for sake of critique | | CSRS Retirement Course | TBD |
| | Project work – customer service data/analysis (status FERS transfer program) | | Continued college courses | TBD |
| | | | Staff Specialist course<br>USDA Management, Analyst course | TBD |
| | | | | TBD |

| 9. Developmental Experience Needed for: | 10. Remarks |
|---|---|
| ( ) Overall career (individual career) development planning<br>( ) More effective performance in present position<br>( ) Future change goals/objectives<br>( ) No further career development desired/needed at present time | *(handwritten remarks)* |

| 11. Employee's Signature | 12. Date | 13. Supervisor's Signature | 14. Date |
|---|---|---|---|
| *(signature)* Yvonne L. Tines | 06/24/98 | *(signature)* | 7/27/98 |

ME FORM 3113-1 (Revised 9/84)
Supersedes previous edition

| Developmental Objectives | 7. Developmental Assignments (Cite Best Info. Available) | 8. Formal Training & Other Activ. (Cite Best Info. Available) | 9. Scheduled Dates Where Possible |
|---|---|---|---|
| Ability to plan, organize, prioritize and coordinate work | Small in-basket exercises | USDA "Time Management training" | TBD |
| Ability to meet and deal with a variety of people | | | |

EXHIBIT 2

Interoffice Memo

Date:      06/24/98

To:        Ernest J. Landry, Manager, Human Resource
           Management Division, ANE-10

From:      Yvonne L. Tines, Personnel Assistant, ANE-14A

Subject:   Individual Development Plan/Temporary
           Promotion/Detail


Attached is the Individual Development Plan (IPD) in which we discussed on June 15, 1998. I have
incorporated the changes from that meeting.


During the weekly HRM staff meeting on June 16, 1998, it was announced that plans are to move ahead
with the reorganization plan that was developed by the Organizational Design Team. Three position have
already been filled from this plan (two FG-14 team leaders and one labor relations specialist, FG-13). The
recommendation to develop the position description for the Employee Relations Specialist, FG-9/11 is in
development. This position will be created to provide expert advisory services in the areas of leave, health
and life insurance and to provide back up to the Retirement Officer.


I will be eligible for promotion to the FG-9 grade level on July 5, 1998. I would like to request a
temporary promotion to this position. I feel that I am qualified for this position based on performance of
the following:


New England Region Coordination Leave Donor Program

Team Leader for the Pre-Employment/New Employee Orientation Workgroup

Presentator at the New Employee Orientation

Developed a Powerpoint Presentation describing the various types of leave programs

Presented Thrift Savings Plan (TSP) Briefings during retirement seminars

Attended TSP and Retirement training courses

Processed TSP open season enrollments

Processed open season enrollments for health insurance

Processed life insurance enrollments for ANE-1,6,7,9,10,40,50,100,200,300,600,700


I request your concurrence in the temporary promotion/detail along with continued performance of my
current duty assignments. Please respond within two weeks of my July 5 eligibility date.


*Yvonne L. Tines*

Yvonne L. Tines


*Confidential*

EXHIBIT 3

Interoffice Memo

Date:       07/16/98

To:         Ernest J. Landry, Manager, Human Resource
            Management Division, ANE-10

From:       Yvonne L. Tines, Personnel Assistant, ANE-14A

Subject:    Follow-up on an Individual Development Plan and
            Request for Temporary Promotion/Detail

On June 24, 1998, you were given my Individual Development Plan (IDP), which we discussed on June 15. After this meeting, the suggested recommendations were incorporated and awaiting your signature. To date, this IDP has not been signed and returned nor have I received follow-up as to its status. If there are any concerns in reference to this IDP, I would appreciate a written response within two weeks as to why this IDP has not been signed and returned to me.

In addition to the above, I also submitted a request for a temporary promotion/detail to the newly created and approved position of Employee Relations Specialist, FG-9/11. This position was outlined by the Organizational Design Team. You announced at our weekly staff meeting on June 16 that you were moving ahead with plans to fill this position along with other positions under the HR reorganization.

I had requested a response to my memorandum within two weeks of my eligibility to be promoted/detailed to the FG-9 grade. Since the time of my request for a temporary promotion/detail, it was announced at the weekly staff meeting on June 30 that the reorganization will continue. This would occur with the recruitment to fill a clerk at the grade level of 3/4/5/6 and a personnel assistant at the 7 grade level. Also a decision needed to be made on the Labor Relations Specialist, FG-11, since the present employee is currently serving a temporary promotion. The Employee Relations Specialist, FG-9/11 would be put on hold. It was also stated at the weekly Operations Branch meeting on July 2 that there would be a delay in filling the Employee Relations Specialist, FG-9/11. It was also stated that this position, "would be filled but the time was not right but it still has the support of the Regional Administrator".

Since I had requested a response within two weeks from my eligibility for promotion/detail, should I presume from these two staff meetings that my request for a temporary promotion/detail will not take place. Please response in writing by the close of business on Thursday, July 30.

Yvonne L. Tines

*Confidential*

EXHIBIT 4

Subject: Follow-up on IDP and Request for          July 22, 1998
Temporary Promotion/Detail

From: Manager, Human Resource Management Division, ANE-10

To: Yvonne Tines

Attached is a signed copy of your proposed Individual Development Plan. As I have stated in the past, I would like to support the developmental assignments and training identified, consistent with the availability of funds and the needs of the organization during the developmental timeframes indicated.

I have reviewed you request for temporary promotion and detail to the Labor Relations Branch, ANE-16. Over the next several months the Operations Branch, ANE-14 will be experiencing critical staffing shortages in the personnel process/administrative function based on the pending loss of one personnel assistant to maternity leave within the next two weeks, the projected maternity leave, beginning in November, of another employee involved in personnel process functions and the current vacancy of an administrative/clerical position.

Since your primary functions involve personnel process functions in support of ANE-14 it is essential that you be available during this period to continue to perform those functions. As such, I cannot grant a temporary promotion/detail at this time.

As you mention in your letter, I still intend to establish the Employee Relations Specialist, FG-9/11 when I feel that the workload conditions in the division will allow it.

I appreciate your interest in developing an IDP to further develop your skills in the HRM functional areas as well as your desire to take on new and challenging assignments through details or temporary promotions.

I would be glad to discuss this further if you would like.

Ernest J. Landry

EXHIBIT 5



U.S. Department
of Transportation

**Federal Aviation
Administration**

# Memorandum

Subject: **ACTION:** Return to duty

Date: March 13, 2003

From: Manager, Human Resource Management
Division, ANE-10

Reply to
Attn. of:

To: Yvonne L. Tines Jones

The purpose of this letter is to convey my decision
regarding your request for reasonable accommodation and to
follow-up on our telephone conversation of Monday
afternoon, March 10, 2003 regarding your return to duty.

In a memorandum to me dated January 10, 2003 you requested
a reassignment to Nashua, New Hampshire to execute your job
responsibilities as a reasonable accommodation of a claimed
disability. In reviewing that request and previous medical
documentation submitted, I concluded that there was
insufficient information available to make a determination
whether you were a qualified individual with a disability
and what an effective accommodation might be. On January
31, 2003 I requested additional medical documentation from
you for that purpose.

On March 10, 2003 you faxed me additional medical
documentation from your psychiatrist, Elizabeth A.
Blencowe, M.D. That medical documentation, dated February
21, 2003, indicates that you are able to return to work and
perform all of your assigned duties at your workplace.
Therefore, I have concluded that you do not have a work
related disability and that reasonable accommodation is not
necessary.

In our discussion of March 10, 2003, I indicated that I had
reviewed the medical documentation that you submitted and
that it appeared that you were able to return to work and
perform your normal job assignments. I asked if you planned
to return to work the following day (March 11, 2003). In

2

response, you asked whether I planned to reassign you to a position in Nashua, N.H. I indicated that I did not plan to reassign you. You then asked if I intended to reassign you to a supervisor other than your current one. I indicated that I did not intend to do that. At that point you indicated that you did not intend to return to work until you contacted your attorney and that he would be in contact with me.

Over the past months we granted you leave without pay (LWOP) due to your medical condition. The most recent LWOP action was scheduled to end on March 22, 2003. I have enclosed the employee copy of that most recent LWOP action for your records. However, since the medical documentation indicates that you are able to return to duty at this time, I intend to terminate the LWOP effective March 15, 2003. As a result, I expect you to return to duty in your normal work assignment on Monday, March 17, 2003. If you fail to return on this date I will consider you to be absent without leave.

I look forward to seeing you on Monday.

Ernest J. Landry

.

# EXHIBIT 6

.



**U.S. Department
of Transportation
Federal Aviation
Administration**

# Memorandum

New England Region, ANE-14A
12 New England Executive Park
Burlington, MA 01803-5299

---

Subject: <u>ACTION</u>: Health Benefits Open Season Coordinator

Date: October 8, 1998

From: Personnel Assistant, ANE-14A

Reply to
Attn. of: Yvonne L. Tines:
781-238-7286
FAX:781-238-7253

To: Susan E. Nason, Team Leader, Operations Branch, ANE-14

In response to your cc:Mail message dated 10/01/98 regarding the two new personnel assistants and work assignments, I would like to request that I have full responsibility and duties associated with the Health Benefits Open Season. This assignment will eventually be incorporated into the newly created position, FG-9/11 (series to be determined) within ANE-16. I currently process all the open season employee changes associated with the Thrift Saving Plan (TSP).

I recently requested and was denied the opportunity for a detail/temporary promotion to assume the duties that will be established in the new position. This denial was because I was considered "valuable" to the processing of personnel actions. While I can appreciate and understand the reasons for the denial, however, my opportunities to enhance my skills in another areas relating to this new position are being short changed.

I would appreciate your response by Friday, October 16, 1998.

*Yvonne L. Tines*

10/13/98

Met with Susan and mentioned the memo but it may have been lost in the shuffle during the move. She stated that she had seen my memo and it was fine for me to be the coordinator.

FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 USC 552)

EXHIBIT 7

Author:  Ernie Landry at ANE10
ate:    3/29/99  4:29 PM
ormal
TO: Kerry Lange at AHR-FOB10A
CC: Larry Piro, Gina Razel
Subject: Training for your Benefits Staff
--------------------------------- Message Contents

    Kerry,

    Larry Piro will be our representative to the Benefits Conference. His
    phone # is 781-238-7281 and FAX is 7283. He is on Annual leave this
    week and will return on 4/5.

    Thanks,

    Ernie


_____    Forward Header ____ ___ ____ _____
Subject: Training for your Benefits Staff
Author:  Christine Comer at AHR-FOB10A
Date:    3/19/99 11:37 AM


    HRMO's--

    I am pleased to be be able to tell you all that the HR Training budget
    is going to be able to fund attendance for one person from each region
    at the 1999 OPM Federal Benefits Conference.  The conference will be
    held at the Sheraton Baltimore North Hotel from June 8 - 11.  The
    conference will cover topics such as long term care, FEGLI, OWCP,
    Social Security, TSP, Military Retired Pay, new approaches for
    communicating benefits information, and some personnel/payroll
    integration issue.  Additional detailed information is available on the
    OPM website at www.opm.gov/asd

    We will be able to pay for the basic conference registration and
    travel and per diem for one person from each of your staffs.  There
    are some excellent pre-conference workshops on selected topics for
    which you may want your person to register and for which you'd need to
    pay (max is about $225 I think).

    The administrative specifics about how registration and the travel
    will be handled are being worked out right now and we'll get that info
    to you as soon as we know it.  (in other words...I'm not holding
    back--I'm telling you everything I know at the moment--but stay tuned)


    In the meantime, we'd appreciate your sending us the name of the
    person who will be attending from your organization.  I know you'll
    want to send one of your best benefits specialists with the most
    comprehensive knowledge, so that that individual can bring the
    valuable information back to the rest of your staff.

    Please have your staff member send an e-mail note to Kerry Lange
    (202-493-4493) the Benefits Team Leader NLT Friday, March 26th.  Since

we'll have someone from each region. We'll also schedule some hours for
Case 1:05-cv-10082-LTF Document 32-2 Filed 04/01/2008 Page 19 of 58
session or two while 're there.

We're really excited that the funds are available for the conference.
I think it is one of the best "one-stop shopping" conferences for good
nuts and bolts info and training on the many Benefits programs!

Have nice weekends.

Chris Comer
77204

EXHIBIT 8

# UNITED STATES DEPARTMENT OF TRANSPORTATION

## DEPARTMENTAL OFFICE OF CIVIL RIGHTS

# AFFIDAVIT
DOT 1-99-1077

I, Ernest J. Landry, employed by the Federal Aviation Administration, New England Region, Human Resource Management Division, located at 12 New England Executive Park, Burlington, MA 01803-5299, make the following statement to MAUREEN NASH-COLE, who has identified herself to me as an EEO INVESTIGATOR for the U.S. DEPARTMENT OF TRANSPORTATION, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party.

**I HEREBY SOLEMNLY SWEAR** that I am a white Caucasian. My immediate supervisor is Mary Ellen Dix, Deputy Assistant Administrator, HRM, and my second-line supervisor is Glenda Tate, Assistant Administrator, HRM. I have been employed by the FAA for approximately twenty-four (24) years. I currently hold the position of Manager, Human Resource Management Division (HRMD).

Management is responsible for identifying training needs within the organization. This is often done in collaboration with the employee. If the employee identifies a training need and/or a training course that they believe would be appropriate for them to attend, they usually bring that to the attention of their manager and discussions would take place as to the relevancy, appropriateness and funding availability. In this office, the practice generally is that a SF-182 is not prepared until we are fairly certain that the employee is going to attend the training.

When I was deciding who should attend the 1999 Federal Benefits Conference to be held in Maryland on June 8-11, 1999, the two primary people I considered

Page 1 of 4                                                     INITIALS _____

were Larry Piro, Personnel Management Specialist (PMS), FG-201-13 and Utta Carr, PMS, FG-201-12. Headquarters was funding attendance at this conference and had allocated one quota to each regional HRMD.

I chose to have Mr. Piro attend because he was conducting a review of the benefits function in the HRMD at my request. The purpose of this review was to develop recommendations as to how the benefits functions might be organized in the HRMD. At that time I was considering assigning him oversight of the benefits area. I do recall announcing at a staff meeting that I planned to have Mr. Piro oversee the benefits area but it eventually did not happen.

I chose to have Mr. Piro attend the benefits conference to gain insight into changes expected in the federal benefits arena in 1999/2000 with the idea that this information was beneficial to the study he was conducting and to his potential future role of oversight of the benefits function. The next person that I probably would have considered would have been Ms. Carr, because she functions at the specialist level and has the responsibility of overseeing the retirement and TSP functions.

I don't recall Ms. Nason informing me that Ms. Tines wanted to attend the conference.

While Ms. Tines believes she should have been selected to attend the conference, at the time of the conference there were two other individuals (Rose Kennedy and Patti Torrisi) in addition to the Complainant that provided benefits processing functions as a part of their job. To have arbitrarily selected Ms. Tines would have denied the other two similarly situated individuals the same developmental opportunity.

INITIALS  *EC*

Attendance at a conference could be considered training depending on the nature of the attendee's position, and the types of information provided at the conference. Since I had planned to assign Mr. Piro oversight of the benefits area, it was my feeling that his attendance at the conference would provide him the knowledge to perform that function more effectively. Based on the nature of Ms. Tine's position, it was my feeling that her attendance at the conference would have been more a developmental opportunity.

I don't recall specifically the first time that I became aware that Ms. Tines wished to attend the conference, but I do recall receiving an e-mail message from Kerry Lange (May 18, 1999) asking if I wanted to respond to an e-mail message that she had received from Ms. Tines, requesting clarification as to who can attend the benefits conference. I then spoke with Ms. Tines on May 19, 1999, and told her that anyone was eligible to go to the conference, but that our local decision was to send Mr. Piro, since he would be looking at how the benefits functions could be organized and since he would be assuming oversight responsibility for the benefits area. I don't recall any further conversation with respect to the conference with Ms. Tines after this point.

In the HRMD we strive to assist everyone in developing to his/her full potential. Over the past five years Ms.Tines has been given a number of developmental opportunities, including government training classes and college courses (a copy of Ms. Tines' training history is attached), a non-competitive temporary promotion to the FG-9 level, and projects such as taking the lead on health benefits open season and FEGLI open season. We have and we continue to offer her developmental opportunities.

**I HAVE READ THE ABOVE STATEMENT WHICH IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.**

INITIALS _____

_Ernest J. Landry_         _5/9/00_
**Ernest J. Landry**         **Date**

**Sworn and subscribed to me this the 5th day of May 2000.**

_Maureen Nash-Cole_         _5/9/00_
**Maureen Nash-Cole**         **Date**
**EEO Investigator**

INITIALS _EL_

## PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement, or other type of testimony, is derived from one or more of the following:

5 C.F.R. §§ 5.2-5.3; 29 C.F.R. Part 1614; 5, U.S.C. §§ 1303-1304; 42 U.S.C. § 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) compliant of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Failure to furnish the information requested will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Failure to furnish the above requested information by present or prospective Government Contractors, where the contract so provides, may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Witness

Date: 5/5/00

Maureen Nash-Cole
EEO INVESTIGATOR

Date: 5/5/00

EXHIBIT 9

As of 04-26-2000

# Integrated Personnel and Payroll System

(Contains Privacy Data P.L. 93-579, Privacy Act)

## Employee Training Report

SSN: 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
Admin: FA

Name: JONES, YVONNE L T
Region: NEW ENGLAND REGION
Position Title: STAFFING ASSISTANT

Education Level: 1 YEAR COLLEGE
Degree:
Major:                    From:

PP-Series-Gr-Step:FV-0203-E-00
Org Code: NE014

| COURSE NUMBER | COURSE TITLE | COMPLETION DATE | HOURS | GRADE |
|---|---|---|---|---|
| 01306 | MANAGING CHANGE | 04-16-1999 | 31 | PASS |
| 01199 | FACILITATOR TOOLS FOR EFFECTIVE MEETINGS | 03-24-1999 | 4 | PASS |
| 01253 | EFFECTIVE QUESTIONING -- A DIFFERENT WAY TO COMMUNICATE | 03-23-1999 | 4 | PASS |
| 01239 | INFLUENCING SKILLS | 03-22-1999 | 4 | PASS |
| 08003 | HRPM-EMPLOYMENT TRAINING | 03-17-1999 | 12 | PASS |
| 99922 | MICROSOFT POWERPOINT 97 | 02-16-1999 | 4 | PASS |
| 99913 | PREVENTING HARASSMENT IN THE FAA | 07-21-1998 | 4 | PASS |
| 99903 | COMMUNICATIONS FEEDBACK AND CONFLICT MANAGEMENT | 05-28-1998 | 8 | PASS |
| 00000 | BASIC EMPLOYEE BENEFITS FOR PERSONNELISTS (USDA) | 04-24-1998 | 40 | PASS |
| 99853 | INTRODUCTION TO THE INTERNET AND WORLD WIDE WEB | 01-16-1997 | 3 | PASS |
| 00000 | CONFLICT AND CONFRONTATION SKILLS | 07-25-1996 | 8 | PASS |
| 00000 | PERSONNEL MANAGEMENT ( HESSER COLLEGE) | 06-20-1996 | 32 | PASS |
| 00000 | POWERPOINT | 05-20-1996 | 8 | PASS |
| 00000 | INTRODUCTION TO BUSINESS LAW - BAD330 | 12-14-1995 | 32 | PASS |
| 08050 | BASIC STAFFING AND PLACEMENT | 09-29-1995 | 40 | PASS |
| 08057 | RETIREMENT WORKSHOP | 09-20-1995 | 8 | PASS |
| 00000 | ORGANIZATIONAL BEHAVIOR, BAD200 | 08-24-1995 | 32 | PASS |



rec'd from E. LANDRY



| 08056 | PAY SETTING WORKSHOP | 08-11-1995 | 16 | PASS |
|---|---|---|---|---|
| 00000 | PRINCIPLES OF MANAGEMENT | 06-22-1995 | 32 | PASS |
| 00000 | ENGLISH 105, ORAL COMMUNICATION | 04-27-1995 | 32 | PASS |
| 02302 | (TVT) GATHERING AND ORGANIZING INFORMATION | 03-29-1995 | 4 | PASS |
| 02300 | HIV/AIDS AWARENESS (SATELLITE) | 01-18-1995 | 3 | PASS |
| 00000 | MARTIN LUTHER KING DAY ETHNIC BUFFET | 01-11-1995 | 4 | PASS |
| 00000 | WINDOWS 3.1 FUNDAMENTALS | 10-28-1994 | 8 | PASS |
| 99795 | ADULT CPR RECERTIFICATION | 10-12-1994 | 3 | PASS |
| 00000 | SEMINAR FOR ADMINISTRATIVE, SECRETARIAL AND CLERICAL EMPLOYE | 05-27-1994 | 32 | PASS |
| 99735 | WINDOWS 3.1 BEGINNERS SELF STUDY | 03-28-1994 | 8 | PASS |
| 99510 | STANDARD FIRST AID AND ADULT CPR TRAINING | 09-15-1993 | 8 | PASS |
| 99728 | CULTURAL DIVERSITY AWARENESS TRAINING | 02-19-1993 | 8 | PASS |
| 83080 | FAA CERTIFICATION/AUDITING COURSE | 09-18-1992 | 20 | PASS |
| 00000 | USING THE FEDERAL PERSONNEL MANUAL | 04-14-1992 | 8 | PASS |
| 01589 | CPMIS PROCESSING OF PERSONNEL ACTIONS | 03-13-1992 | 36 | PASS |
| 00000 | MENTEE WORKSHOP | 01-09-1992 | 8 | PASS |
| 99665 | ADVANCED WORDPERFECT 5.0 | 09-13-1991 | 8 | PASS |
| 99694 | DIRECTIVES MANAGEMENT COURSE | 06-28-1991 | 12 | PASS |
| 00000 | PROCESSING PERSONNEL ACTIONS | 05-03-1991 | 40 | PASS |
| 00000 | WOMEN IN GOVERNMENT SEMINAR | 01-24-1991 | 8 | PASS |
| 00000 | HOW TO BE A BETTER PROOFREADER | 08-29-1990 | 8 | PASS |
| 00000 | TIME MANAGEMENT | 08-07-1990 | 4 | PASS |
| 14014 | WRITING IMPROVEMENT | 01-01-1990 | 32 | WITH |
| 14015 | BASIC CLERICAL/SECRETARIAL TECHNIQUES | 01-01-1990 | 40 | WITH |
| 05567 | NEW EMPLOYEE ORIENTATION PROGRAM | 07-17-1989 | 18 | PASS |
| 14017 | INTRODUCTION TO EMERGENCY READINESS | 05-31-1989 | 32 | 0094 |
| 99654 | WORDPERFECT 5.0 | 04-12-1989 | 16 | PASS |
| 14036 | TIME AND ATTENDANCE REPORTS AND RECORDS (OPTICAL SCAN) | 04-05-1989 | 48 | 0100 |
| 99615 | DISK OPERATING SYSTEM (DOS) | 02-16-1989 | 9 | PASS |

Export This Report to Excel



EXHIBIT 10

## UNITED STATES DEPARTMENT OF TRANSPORTATION

## DEPARTMENTAL OFFICE OF CIVIL RIGHTS

### AFFIDAVIT
### DOT 1-99-1077

I, Susan E. Nason, employed by the Federal Aviation Administration, New England Region, Human Resource Management Division, located at 12 New England Executive Park, Burlington, MA 01803-5299, make the following statement to MAUREEN NASH-COLE, who has identified herself to me as an EEO INVESTIGATOR for the U.S. DEPARTMENT OF TRANSPORTATION, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party.

**I HEREBY SOLEMNLY AFFIRM** that I am a white Caucasian. My immediate supervisor is Ernest Landry, and my second-line supervisor is Mary Ellen Dix. I have been employed by the FAA for approximately eight (8) years. I currently hold the position of Supervisory Personnel Management Specialist, FV-201-J, since March 2000. Prior to this I held the position of Team Leader, FG-201-14, HRMD.

Please explain your working relationship with the Complainant?

I became the Team Leader ifor the Operations Branch of HR on 5/24/98. Ms. Tines was a member of the Operations Team. As a Team Lead I had the authority to approve leave, distribute and review work, identify problems and issues, recommend training, recommend awards for employees, etc. I had no supervisory responsibility with respect to performance appraisals, I gave input to Mr. Landry who was the first line supervisor for my team members.

How long have you been the Complainant's supervisor?

Since March 2000.

What is the practice in HRMD when an employee wants to attend a conference? Please explain.

Page 1 of 4

INITIALS _SEN_

I would say that if it's something that we are made aware of as management, I may go out to all employees and see who's interested, or I may approach a specific employee if I think the conference opportunity most closely relates to their particular duties and responsibilties. That is what I would classify as management initiated. Sometimes employees come and request some type of training. I would say that any type of request like that would go to Mr. Landry, because we would have to evaluate the budget situation. I have no authority to approve anyone to attend training because of budget restrictions. It is always something that is discussed. Usually Mr. Landry, Gina Razel and I would meet and prioritize requests for training or attendance at conferences.

Employees bring training requests to my attention in different ways, such as verbally or via e-mail. The preparation of a SF-182 is only completed after an employee receives notification from management that they can attend a specific training or conference. This is my perception of the process.

Did the Complainant ask you if she could be considered to attend the 1999 Federal Benefits Conference that was held on June 8 – 11, 1999? Please explain.

I think I received a request from her to attend the conference, in the form of a memo or e-mail.(Note: After checking my records, the request that I was thinking of was actually for something else. I have no record of a request to attend this particular conference). At this point I was the Team Leader, and I had no authority to approve any training requests, so I would have forwarded it to Mr. Landry. During a management meeting with Mr. Landry, Gina Razel, and myself we did talk about attendance at this conference. We discussed who should attend, if anyone, and what would make the most sense for the organization.

Did any other employee in HRMD ask if they could be considered to attend the same conference? Please explain.

I do not recall that anyone else on my Team asked to attend. This was a request that was initiated by Ms. Tines. I'm not sure who was aware of the conference, and it is possible that other employees may have expressed interest if they had been aware of it.

Do you know who from HRMD attended the conference? Why were they selected to attend? Please explain.

Larry Piro, who was not on my Team, attended the conference. The decision was made by Mr. Landry to send Larry. At this point we were looking at the whole area of benefits, and where that was going. Larry had been identified by

INITIALS _SEN_

Mr. Landry to take the lead in looking at how benefits operated in our office, and what was going on the broader context of the federal government. Larry has a very analytical mind with respect to thinking about what might make sense for the organization. I believe he was tasked with the responsibility of analyzing and making recommendations with respect to how the Division would handle the benefits functions.

It would be nice for anyone to go to this conference. I'm not sure how many slots we had for this conference. I know we did not have more than one, but I'm not sure if we had to fund or Headquarters funded it. There would be no way we would have ever sent two people to this type of conference, because it also involved travel funds.

I'm sure we talked about Ms. Tines wanting to go. If Ms. Tines were to attend this conference, it would have been more of a developmental opportunity for her, based her responsibilities in the benefits area. I think this is why she was interested in attending. For Mr. Piro, I think his attendance was designed to provide him with information that he could then bring back and utilize in our local examination of the benefits functions and how they operated. This type of conference focuses on what's coming in the future in the benefits area and not simply what the current situation is.

Did you have any input into the decision as to who would attend the conference? Please explain.

I did think that it would have been a good developmental opportunity for Ms. Tines to attend the conference. She did have benefits responsibilities. However, I did understand the decision to send Mr. Piro.

Do you have any additional information to add?

I do not think that Ms. Tines race had any impact on the decision to send Mr. Piro to the conference. I do not believe any discrimination occurred in this decision.

Do know of anyone who could supply me with any additional information?

NO.

**I HAVE READ THE ABOVE STATEMENT WHICH IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.**

Page 3 of  4                                                    INITIALS  SDN

_____          _____
**Susan E. Nason**                          **Date**   5/9/00

**Sworn and subscribed to me this the 8th day of May 2000.**

_____          _____
**Maureen Nash-Cole**                       **Date**   5/9/00
**EEO Investigator**

INITIALS _____

## PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement, or other type of testimony, is derived from one or more of the following:

5 C.F.R. §§ 5.2-5.3; 29 C.F.R. Part 1614; 5, U.S.C. §§ 1303-1304; 42 U.S.C. § 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) compliant of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Failure to furnish the information requested will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Failure to furnish the above requested information by present or prospective Government Contractors, where the contract so provides, may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_Susan S. Larson_
**Witness**

Date: _5/8/00_

_Maureen Nash-Cole_
**Maureen Nash-Cole**
**EEO INVESTIGATOR**

Date: _5/8/00_

EXHIBIT 11

## UNITED STATES DEPARTMENT OF TRANSPORTATION

## DEPARTMENTAL OFFICE OF CIVIL RIGHTS

## AFFIDAVIT
## DOT 1-99-1077

I, Gina Razel, employed by the Federal Aviation Administration, New England Region, Human Resource Management Division, located at 12 New England Executive Park, Burlington, MA 01803-5299, make the following statement to MAUREEN NASH-COLE, who has identified herself to me as an EEO INVESTIGATOR for the U.S. DEPARTMENT OF TRANSPORTATION, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party.

I **HEREBY SOLEMNLY SWEAR** that I am a white Caucasian of Western European descent. My immediate supervisor is Ernest J. Landry, and my second-line supervisor is Mary Ellen Dix. I have been employed by the FAA since October 1991. I currently hold the position of Supervisory Personnel Management Specialist, since March 2000. Prior to this position I held the position of Team Leader, Management and Employee Effectiveness Branch, HRMD, since May 1998. My first line supervisor was Mr. Landry at that time.

Please explain any working relationship you have had with the Complainant? When?

The only supervisory responsibility was when I was in an Acting capacity when Mr. Landry was out. During this time there were occasions when I spoke with Ms. Tines regarding on the job behaviors. She was always receptive to my feedback.

What is the practice used in HRMD to attend training? Please explain.

It is a combination of management identifying training needs for specific employees and also employee identifying training that they would like to attend. For example, Ms. Tines had taken some college courses that she had identified. Usually there is a verbal discussion that takes place before the preparation of a formal training request. I have always operated under the belief that it was Ernie

Page 1 of _____

INITIALS _____

*who*
~~that~~ made final decisions with respect to training. Due to recent constraints on funding for training and travel it was necessary to evaluate all training requests and prioritize them according*ly*

Do you have any knowledge that Ms. Tines requested to attend a 1999 Federal Benefits Conference held June 8 – 11, 1999? Please explain.

I don't recall.

Do you know who attended that conference, and why they were selected to attend? Please explain.

I believe at one of our Monday morning management meetings, Ernie, Susan, and I discussed the possibility of Larry Piro, who was assigned to my Team, attending the conference. I do not recall Ms. Tines name being mentioned as a possible attendee.

At this point in time, Mr. Landry had tasked Mr. Piro to take a look at the benefits functions, and evaluate, to see if there was a need to create the Employee Relations Specialist, FG-9, position that was identified by the Organizational Design Team. Mr. Piro prepared a document and identified what the current responsibilities of the FG-12 were and what responsibilities could be assigned to the possible future ERS, FG9. It was agreed that sending Larry was a good choice due to the fact that he was recently assigned as the Benefits Team Lead in order to assess benefits servicing. I do believe it was announced at a staff meeting that he would be doing this.

Did anyone on your Team request to attend the conference?

NO. I don't remember anyone else being considered to attend this conference.

INITIALS _____

Do you have any further information?

Do you know anyone that could offer me any further information?

**I HAVE READ THE ABOVE STATEMENT WHICH IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF.  I UNDERSTAND THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.**

**Gina Razel**                          **Date**  _10-17-00_

Sworn and subscribed to me this the 8th day of May 2000.

**Maureen Nash-Cole**                   **Date**  _5/9/00_
**EEO Investigator**

INITIALS

## PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement, or other type of testimony, is derived from one or more of the following:

5 C.F.R. §§ 5.2-5.3; 29 C.F.R. Part 1614; 5, U.S.C. §§ 1303-1304; 42 U.S.C. § 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) compliant of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Failure to furnish the information requested will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Failure to furnish the above requested information by present or prospective Government Contractors, where the contract so provides, may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

**Witness**

Date: _8 May 00_

**Maureen Nash-Cole**
**EEO INVESTIGATOR**

Date: _5/8/00_

EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YVONNE L. TINES JONES,

        Plaintiff,

v.

NORMAN Y. MINETA,
Secretary,
U.S. DEPARTMENT OF
TRANSPORTATION,

        Defendant.

CIVIL ACTION NO.

# 05 · 10082 EFH

VERIFIED COMPLAINT AND DEMAND
FOR JURY TRIAL

## I.   Introduction

1. This is a civil action brought by the plaintiff, Yvonne L. Tines Jones ("Tines Jones"), against her employer, the U.S. Department of Transportation ("Agency"), for employment discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e-2 *et seq.*; and Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*. The plaintiff alleges that the Agency discriminated against her in terms, conditions and privileges of employment because of her race, color (black) and national origin (African-American), failed to accommodate her handicap, discriminated against her on the basis of her handicap, and retaliated against her because she complained about discrimination and filed discrimination charges against the Agency.

2. Ms. Tines Jones seeks injunctive relief, equitable relief and damages to redress the deprivation of, and

secure protection of statutory rights to employment free from discrimination based on race, color and handicap.

3. This Court has subject matter jurisdiction under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.* and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e *et seq*. The Court has jurisdiction over claims arising under the laws of the United States, 28 U.S.C. § 1331, 1343, and 1367(a).

4. Venue is proper in this district pursuant to 28 U.S.C. §§1391(b) and 1391(c) in that the claims arose in the District of Massachusetts and the defendant conducts business in the District of Massachusetts.

## II.  PARTIES

5. The plaintiff, Yvonne Tines Jones, is an African-American woman, who was employed by the Federal Aviation Administration's New England Regional Human Resource Management Division (the "Division"), Burlington, Massachusetts as a Staffing Assistant FV-0203-E (GS-8) since July 1989. She is an employee within the meaning of 42 U.S.C. § 2000e(f).

6. The defendant, U.S. Department of Transportation Federal Aviation Administration New England Region (the "Agency"), Human Resource Management Division, is a federal agency located in Burlington, Massachusetts and is an employer within the meaning of 42 U.S.C. § 2000e(b).

2

III. <u>FACTS</u>

7.    As a Staffing Assistant, the plaintiff was responsible for screening applications for a variety of occupations, providing merit promotion services for a variety of low grade positions, performing staff support and assistance work for one or more Personnel Management Specialists and ensuring the accuracy of staffing actions.

8.    On June 15, 1998, the plaintiff developed an "Individual Development Plan" (IDP) with Ernest Landry (white male), Division Manager, to build her expertise in the area of benefits program administration. This was done in accordance with an approved reorganization plan developed by employees in the Division.

9.    The training opportunities afforded the plaintiff fell far short of the requirements of her IDP.

10.    On June 24, 1998, the plaintiff submitted a request for a temporary promotion/detail to Ernest Landry that would have given her experience in the areas of retirement and worker's compensation.

11 .    Ernest Landry denied the plaintiff's request.

12.    The defendant denied the plaintiff's request because of her race and color (black).

13.    On February 11, 1999, the plaintiff learned of a federal benefits conference entitled "Benefits in the New

3

Millennium" to be held June 8[th] to June 11[th], 1999 in Washington, D.C.

14.    The plaintiff told her first line supervisor, Susan Nason (white female), Supervisory Personnel Management Specialist, about the conference and asked if she could attend the training since she had developed an IDP.

15.    Nason told the plaintiff that there was not money in the budget to send anyone to the conference.

16.    The defendant sent Larry Pino (white male), Personnel Management Specialist (FG-0201-13) to the conference.

17.    The defendant refused to send the plaintiff to the conference because of her race, color (black) and national origin (African-American).

18.    On or about July 26, 1999, the plaintiff contacted an EEO counselor and filed a formal complaint DOT 1-99-1077, alleging that the agency discriminated against her in terms, conditions and privileges of employment on the basis of race, color (black) and national origin (African-American).

19.    Up to this point in her career as Staffing Assistant, the plaintiff had never encountered difficulties in performing her job at or above the level of her employer's expectations.

4

20.    On September 10, 1999, the Agency posted a vacancy for the position of Personnel Management Specialist (an FG-0201 comparable to a GS-7/9/11).

21.    On September 20, 1999, the plaintiff applied for the position. On September 28, 1999, she was interviewed for the vacancy.

22.    On March 16, 2000, Landry informed the plaintiff that he had decided not to fill the vacancy.

23.    The Agency failed or refused to hire the plaintiff for the position because of her race, color (black) and national origin (African-American), and in retaliation for filing a formal discrimination complaint.

24.    On May 5, 2000, the plaintiff filed another formal complaint against the Agency (DOT 1-00-1160) alleging discrimination on the basis of race, color and national origin.

25.    On November 22, 2000, the plaintiff requested a hearing. The Agency received the request on November 29, 2000.

26.    On February 1, 2001, the Administrative Law Judge issued an Order directing the parties to participate in mediation.

27.    On April 19, 2001, the parties entered into an "Interim Settlement Agreement" wherein the Agency agreed among other terms to temporarily promote the plaintiff to

5

the position of Personnel Management Specialist for a period of at least 9 months effective May 6, 2001, in return for the plaintiff's holding the complaint in abeyance.

28.   The Interim Settlement Agreement also provided that if the plaintiff's temporary position was made permanent without competition, the plaintiff would withdraw her complaint and a final settlement agreement would be executed.

29.   The defendant failed to comply with the Interim Settlement Agreement. Specifically, defendant failed to relieve the plaintiff of her duties and responsibilities as Staffing Assistant, failed to meet the plaintiff on a monthly basis to discuss her progress and updates in a collaborative manner, failed to explore options for the mentoring of and the professional development of the plaintiff, failed to execute developmental opportunities, and failed to train the plaintiff consistent with her agreed upon career objective and Individual Development Plan (IDP).

30.   The defendant's failure to act in accordance with the Interim Settlement Agreement was in bad faith, because of the plaintiff's race, color and national origin, and in retaliation for her formal complaints of discrimination.

31.   On February 6, 2002, the plaintiff's physician, Elizabeth Blencowe, M.D. ("Dr. Blencowe") requested a 30-day medical leave of absence on behalf of the plaintiff due to severe stress.

32. On February 10, 2002, the plaintiff began a two-month leave of absence.

33. On March 1, 2002, Dr. Blencowe requested an extension of the plaintiff's leave of absence.

34. On March 6, 2002, the plaintiff filed another formal complaint against the Agency (DOT 1-02-1030) alleging that the Agency failed to comply with the Interim Settlement Agreement because of her race, color and national origin and in retaliation for her complaints of discrimination.

35. In April, 2002, the plaintiff returned to work under a considerable amount of stress and anxiety.

36. In August 2002, Susan Nason aggravated the plaintiff's stress and anxiety by denying that she ever received medical documentation of the need for flex time accommodation. The plaintiff overdosed on panic attack medical in front of Ms. Nason and was immediately taken to the Lahey Clinic Emergency Room for suicide watch.

37. On September 20, 2002, the plaintiff provided Susan Nason with a letter from her doctor, Elizabeth A. Blencowe, M.D. ("Dr. Blencowe") advising Nason of the plaintiff's disability, depression and panic disorder.

38. On December 17, 2002, Dr. Blencowe advised Ernest Landry of the plaintiff's disability and requested a reasonable accommodation. Specifically, she advised, "I

7

recommend strongly that when Ms. Tines-Jones returns to work on 1/6/03 that she be assigned to a different job site and not return to the FAA regional office in Burlington, MA. Ms. Tines-Jones is being treated for Panic Disorder and Depression, which is exacerbated markedly by an adverse work relationship at the FAA Regional Office in Burlington, MA. Therefore, I hope you will grant Ms. Tines-Jones' request to be transferred to a different work site."

39.    On January 15, 2003, Ernest Landry acknowledged receiving the plaintiff's request for reassignment as a reasonable accommodation.

40.    On March 13, 2003, the plaintiff filed another formal complaint against the Agency (DOT-1-1068) alleging that she was denied a reasonable accommodation based on her mental disability when on March 13, 2003, her request for transfer was denied, and that she was subjected to disparate treatment based on her race and color (black), and retaliation when her request for transfer was denied.

## COUNT I: VIOLATION OF TITLE VII, 42 U.S.C § 2000E-2(a)(1)

41.    The plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 40 of the Verified Complaint.

42.    The defendant discriminated against the plaintiff with respect to her terms conditions and privileges of employment because of her race and color (black), in violation of 42 U.S.C. § 2000e-2(a)(1).

8

43.    As a consequence, the plaintiff has suffered and continues to suffer lost wages and benefits, mental and emotional distress and denial of equal employment opportunities.

## COUNT II: VIOLATION OF THE REHABILITATION ACT OF 1973
## 29 U.S.C. § 791 et seq.

43.    The plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 40 of the Verified Complaint.

44.    The plaintiff suffered a disability within the meaning of the Rehabilitation Act.

45.    The plaintiff had a mental impairment which substantially limited one or more of her major life activities, a record of such impairment, or was regarded by the employer as having such an impairment.

46.    The plaintiff was a qualified individual in that she was able to perform the essential functions of her job with a reasonable accommodation.

47.    Despite the defendant's knowledge of the plaintiff's disability, the defendant did not offer a reasonable accommodation for the disability.

48.    As a consequence, the plaintiff has suffered and continues to suffer emotional distress, lost wages and benefits, discrimination in employment, and denial of equal employment opportunities.

## COUNT III: VIOLATION OF TITLE VII: RETALIATION

49.    The plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 40 of the Verified Complaint.

50.    The defendant discriminated against the plaintiff in terms, conditions and privileges of employment because she opposed practices made unlawful under Title VII and/or because she filed a charge of discrimination against her employer under Title VII, in violation of 42 U.S.C. § 2000e-3(a).

51.    As a consequence, the plaintiff has suffered and continues to suffer emotional distress, lost wages and benefits, discrimination in employment, and denial of equal employment opportunities.

## RELIEF AND DAMAGES

WHEREFORE, the plaintiff prays that this Court:

A.    Declare that the plaintiff's legal rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e et seq. have been violated.

B.    Declare that the plaintiff's legal rights under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq. have been violated.

D.    Award the plaintiff back pay and other employment benefits.

E.    Award the plaintiff compensatory damages.

F.    Award the plaintiff punitive damages.

G.    Award the plaintiff attorney's fees, expert fees, costs and interest, including prejudgment interest.

H.    Enjoin the defendant from discriminating against the plaintiff on the basis of race and color.

I.    Enjoin the defendant from retaliating against the plaintiff.

J.    Order that the defendant reassign the plaintiff to the work site she requested as a reasonable accommodation.

K.    Award the plaintiff such other relief as this Court deems equitable and just.

PLAINTIFF CLAIMS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE

The foregoing statement is made this 29th day of December, 2004, under the pains and penalties of perjury.

_____
YVONNE L. TINES JONES

Respectfully submitted,
YVONNE L. TINES JONES
By her attorney

_____
Anthony W. Neal, BBO# 549193
LAW OFFICES OF ANTHONY W. NEAL
434 Massachusetts Avenue, Suite 401
Boston, Massachusetts 02118
Date: December 29, 2004 (617) 424-6161

11

EXHIBIT 13



This Document Produced on 09/20/99

# Department of Transportation
# Federal Aviation Administration
# Internal Vacancy Announcement
# ANE-DSS-99-122-47342

Open Date: Sep 10,1999
Close Date: Sep 20,1999
Position: Personnel Management Specialist ,FG-201-7/9/11
Salary Range: $27,878 to $53,639
Location: Burlington,MA
Organization Location: New England Region, Human Resource Management Division, Management & Employee Relations Branch, ANE-16

PCS: Expenses are not authorized for relocation/moving expenses.

Area of Consideration: Human Resource Management Division Employees Only

Duties: Serves as the Benefits Administrator for the Division. Is considered the expert for the region responsible for the administration, maintenance, and evaluation of work associated with the Health and Life Insurance Programs, Thrift Savings Plan, and Military Deposit Program. Also assists in the Retirement and Occupational Workers' Compensation Programs. Conducts seminars and briefing as necessary. Prepares program publicity and local instructions as necessary. Is responsible for serving as the change agent for the division and the region by keeping abreast of changes as they occur. Insures that all that are impacted by these changes are notified. Works closely with the ANE-14 staff to ensure that they are kept up-to-date on changes in both policy and procedures. Position also requires assisting in processing training actions and providing administrative support for the Computer Based Instruction (CBI) and Interactive Video Training (IVT) Programs.

Important Note: You must indicate the grade or grades that you wish to be considered.

Locality Pay: Salary includes locality pay for this region.

Note: All applicants are required to address the Knowledge, Skills, and Abilities (KSA) stated in the announcement. KSA's must include a written statement describing work that you have performed which demonstrates possession of each Knowledge, Skill and Ability listed below. Each KSA must be individually addressed and the statement must provide sufficient information to determine to what extent a candidate meets a particular KSA. (MANDATORY)

Travel: Position requires occasional travel to different field offices in the region.

SPECIALIZED EXPERIENCE: Applicants must have 52 weeks of experience which demonstrates the ability to gather factual information from regulatory material, to analyze data and other technical references, and to resolve employee relation issues as they relate to the benefits programs described above. To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation.

Evaluation criteria: Eligible candidates will be evaluated based on their possession of knowledge, skills, and abilities related to the position being filled.

1.KNOWLEDGE SKILLS, ABILITIES AND OTHER CHARACTERISTICS (KSAO's) 1. Knowledge of laws and procedures related to Health and Life Insurance Programs, Thrift Savings Plan, Military Deposit, Federal Retirement Systems, Death Benefits, Social Security, and the Occupational Workers' Compensation Programs. 2. Ability to analyze and evaluate information and situations in order to develop useable solutions to benefits issues and problems and to make recommendations. 3. Ability to communicate orally. This requires the incumbent to use "customer service oriented" communication techniques with emphasis on tact, courtesy, clarity, substance and persuasiveness involving technical and

nontechnical material. 4. Ability to communicate in writing: This element includes various communication techniques resulting in written products that convey both technical and nontechnical material with emphasis on clarity substance and persuasiveness. 5. Ability to work independently and as part of a team. 6. Ability to organize work and set priorities in order to meet time lines.

Received by COB: Complete bid packages must be RECEIVED on or before the closing date shown on this announcement.

Send Application Packages to: DOT/FAA, New England Region 12 New England Executive Park Burlington, MA 01803 ATTN: ANE-14

How To Apply Applicants for this position must submit the following: FAA Form 3330-42, Request for Promotion Consideration and Acknowledgement; SF-171, Application for Federal Employment or OF-612, Optional Form for Federal Employment or a resume; and Supplemental Form (see NOTE).

Financial Disclosure The person selected for this position may be required to file a financial disclosure statement within 30 days of entry on duty. FAA policy limits certain outside employment and financial investments in aviation-related companies.

Privacy Act Requirements: Collection of personal identification data is authorized under the Privacy Act (P.L. 93-579).

Equal Employment: The FAA does not discriminate on the basis of political affiliation, race, color, religion, national origin, sex, sexual orientation, marital status, age, disability, or any other characteristics not bearing on job performance.

Prohibition on Personal Use of Government Postage-Paid Envelopes: Use of postage-paid Government envelopes to file job applications is a violation of Federal laws and regulations. Applications submitted in postage-paid Government envelopes will not be considered.

FAA vacancy information and certain application forms are now available on the FAA's World Wide Web site at: http://jobs.faa.gov or by calling our Faxback system at (405)954-0250.

What resume must contain is detailed here

The following forms are electronically attached for your convenience:

OF-612 :Application for Employment
FAA-3330-42 :Request for Promotion Consideration & Acknowledgement

EXHIBIT 14

Request for Information
DOT Complaint Number 1-00-1160
Tines Vs. DOT

#3 – List of Position Advertised, but not filled or selection list cancelled

ANE-DSS-99-122-47342, 9/10/99 – 9/20/99
Personnel Management Specialist, FG-201-7/9/11
No Selection
Reason: pending decision on centralization of FAA Life & Health Insurance Programs

ANE-DSS-99-019-38119, 10/30/98 – 11/12/98
Clerk Typist or Program Assistant (Indefinite) FG-322 or FG-303-3/4/5
No Selection
Reason: hiring freeze

ANE-DSS-98-159-36156, 9/11/98 – 9/15/98
Clerk-Typist or Program Assistant (Indefinite) FG-322 or FG-303-3/4/5
No Selection
Reason: one applicant – decision made to extend the open period for acceptance of applicants.

ANE-DSS-98-134-33816, 8/12/98 – 8/25/98
Personnel Management Specialist, FG-201-12
No Selection
Reason: no bidders

ANE-DSS-98-122-31804, 7/28/98 – 8/11/98
Clerk-Typist or Program Assistant (Indefinite) FG-322 or FG-303-3/4/5
No Selection
Reason: Hiring & Budget Freeze

EXHIBIT 15

7. The Employee Relations Specialist, FG-9/11 is not being filled.

A recent efficiency study within the FAA explored the possibility of centralizing health benefits functions in one location. Other studies are projected which will look at other benefits processing activities to determine potential for improvements and efficiencies. The ANE HRM Division Manager has determined that organizational changes in the benefits area are not appropriate at this time.

EXHIBIT 16

## UNITED STATES DEPARTMENT OF TRANSPORTATION

### DEPARTMENTAL OFFICE OF CIVIL RIGHTS

## AFFIDAVIT
DOT 1-00-1160

I, Ernest J. Landry, employed by the Federal Aviation Administration, New England Region, Human Resource Management Division, located at 12 New England Executive Park, Burlington, MA 01803-5299, make the following statement to MAUREEN NASH-COLE, who has identified herself to me as an EEO INVESTIGATOR for the U.S. DEPARTMENT OF TRANSPORTATION, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party.

I HEREBY SOLEMNLY SWEAR that I am a white Caucasian. My immediate supervisor is Mary Ellen Dix, Deputy Assistant Administrator, HRM, and my second-line supervisor is Glenda Tate, Assistant Administrator, HRM. I have been employed by the FAA for approximately twenty-four (24) years. I currently hold the position of Manager, Human Resource Management Division (HRMD).

In approximately November 1997, I asked HR Division employees to develop recommendations for an organizational model for the Division. One of the recommendations coming out of that report was establishment of an Employee Relations Specialist, FG-9/11 position. Establishment of this position would involve moving a variety of benefits duties from the Operations Team, ANE-14 to the Management and Employee Effectiveness Team, ANE-16. It would also involve moving a position authorization from ANE-14 to ANE-16 to accommodate the new position.

Page 1 of 8                                                    INITIALS _____ *Eℓ* _____

The position was announced in September 1999 as a Personnel Management Specialist, FG-201-7/9/11 to allow maximum consideration of all employees within the HRM division. The area of consideration was the HRM Division. Eileen Celli, was the Personnel Specialist responsible for developing the position description, creating the vacancy announcement, and handling the merit promotion action.

There were two (2) candidates for the position, Rose Kennedy and Yvonne Tines. As part of the selection process I asked Ms. Celli to set up an interview panel. Panel interviews are often used as part of the selection process and in this case I thought it would supply me with an additional perspective about the candidates in addition to the information already available to me. I received the results of the panel interview from Eileen. The material included the questions asked and the answers of each candidate and whether the candidates responses were viewed by the panel as being effective or ineffective. There was no formal selection recommendation made by the panel.

Following the panel interview process, Gina Razel, Susan Nason (both of whom were team leaders) and I had several discussions regarding the specific candidates overall. Ms. Razel was a member of the interview panel and she expressed to me that in her opinion, and the opinion of the panel, Ms. Kennedy was a more successful candidate in the interview process based on her answers to the questions. She indicated, as did the written summary of the panel notes, that in a couple of cases Ms. Tines' responses reflected a degree of rigidity or lack of flexibility.

At that point I decided to interview the candidates myself to obtain additional information about their customer service orientation, flexibility, etc.

INITIALS  *Ep*

On approximately October 1, 1998 I asked Linda Cucchiara to set up interviews for me with both candidates. Ms. Cucchiara was able to scheduled an interview time for Ms. Kennedy. Ms. Cucchiara indicated to me that when she asked Ms. Tines what time she would like the interview, Ms. Tines told Ms. Cucchiara, that she didn't think an interview was necessary since this hadn't been done in other cases.

I then went to Ms. Tines and told her that I wanted to have an interview the following week (October 4, 1999) and she indicated that she was not sure about the need for an interview and would have to check on that and get back to me. She later contacted Ms. Cucchiara and told her she would be available for the interview the following week. The day of the interview, Ms. Tines called me to say that she was sick and to say that she would be available via telephone if I needed to contact her or she would see me upon her return to work on October 18, 1999 after completing her scheduled annual leave.

Ms. Tines' initial responses to me and to Ms. Cucchiara regarding my request for an interview reinforced, for me, the lack of flexibility that had been mentioned earlier as part of the panel interview results. Subsequently, I decided not to conduct the individual interviews since I had enough information at that time to make a decision.

Ms. Nason, Ms. Razel and I had additional discussion about the potential selection. I recall that we all agreed that Ms. Kennedy was overall the best candidate and had the attributes necessary to be successful in this position.

At this point I did not make a formal selection. Around this same period a study group within our line of business (we were a part of the Assistant Administrator for Region and Center Operations, ARC at that time) made some recommendations regarding efficiencies that could be explored within the

organization. One of the potential efficiencies was consolidation of health benefits activities in one location.

Soon thereafter, the HR organization also decided to look at how it could pursue opportunities to provide HR services more efficiently. It was my feeling at that time, that benefits services would be one of the major areas looked at. Since that time, there are further plans to look at those services, and some of the areas being looked at include the benefits area. Since April 2000, I have been a member of the team that will be looking at more effective ways of providing services.

While I was deciding whether to fill the position or not, I asked Ms. Celli to extend the selection certificate for an additional 90-days. In late March I decided not to make a selection for this position, based on the fact that it appeared to me that there were a number of changes that could occur which could impact on the benefits area. Since I did not know what kind of changes might occur in the benefits area, I didn't want to put someone in the position and then have the functions change. Not knowing what was happening with benefits, it just did not make sense to me to fill the position.

I subsequently called both candidates to my office and told them that I had made a decision not to fill the position and why. I then told them that I was going to give them an opportunity to have a temporary promotion to the FG-9 level, working with Utta Carr on retirement, TSP, etc. I saw this as a way for them to get development, and to increase the level of knowledge in the retirement area in the Division. I indicated that I had decided to offer this opportunity for a temporary promotion to all three (3) Personnel Assistants (Kennedy, Tines, Torrisi). Ms. Tines questioned why the opportunity was being offered to someone who did not bid on the position. My response to that was that I wanted to offer that same opportunity to all three because it strengthens the overall

Page 4 of 8                                        INITIALS _____

knowledge base of the Division, and affords them all an equal opportunity for development. I indicated that I would start the rotation with Ms. Tines as the first person.

It is my understanding that Ms. Tines believes that she has been subjected to a pattern of ongoing discrimination.

Ms. Tines apparently perceives that having her promotion effective after Core Compensation implementation rather than before, as in the case of Ms. Celli and Ms. Doyle, is due to discrimination. Ms. Celli and Ms. Doyle received job accretion promotions in their current positions based on accretion of higher level duties. These are higher level functions in their continuing positions. Ms. Tines was receiving a temporary promotion to a new and different position outside of her current organizational unit, the Operations Branch. Because that branch was responsible for implementation of Core Compensation I determined that it was important to maintain the current level of personnel action processing support in that Branch until conversion was completed. Ms. Tines was promoted effective the beginning of the first pay-period after conversion. It should also be noted that a white male employee who was temporarily promoted to a different position than his own received his temporary promotion on the same date as Ms. Tines.

Ms. Tines has apparently indicated that in the past there was consideration around handling OWCP services differently, yet Ms. Doyle was allowed to continue to perform these functions and was promoted. She contrasts this with my decision not to fill the Employee Relations Specialist position because I believed changes to the benefits area are likely. Unlike Ms. Tines' situation where the subject benefits position would have been a new position with new duties, Ms. Doyle had been performing the OWCP duties for some time, in addition to duties related to the awards program and organizational development work. The OWCP duties were a present and continuing assignment for Ms.

Page 5 of 8                                                    INITIALS _*EL*_____

Doyle at the time. It would not have made sense to remove those duties from Ms. Doyle's position at that time. Ms. Doyle continues to perform OWCP duties.

It's my understanding that Ms. Tines has indicated that she is promoted only when white employees can be promoted at the same time. Ms. Tines cites her promotions to FG-7 and to FG-8 as examples. In the first case she was promoted at the same time as Ms. Kerry Ferreira and in the second case at the same time as Ms. Kennedy and Ms. Torrisi.

In the first situation the full performance level of the Personnel Assistants in this division had been FG-6 for some time. In 1997 it was determined that due to substantial downsizing and each of the assistants assuming more duties and responsibilities, that a change in grade was warranted. As a result, the full performance level of Personnel Assistants in this division was determined to be FG-7 and both assistants were promoted simultaneously.

Similarly, the second situation involved a determination by this office that the Personnel Assistant jobs had become considerably more complex, that the individuals were expected to function with significantly less supervision and that the positions warranted a FG-8 grade. All three of the individuals in the Personnel Assistant position in this HRM Division were promoted simultaneously. This same approach was also taken by a number of HRM Divisions in other regions.

Both of the above cases were situations where management made a decision that the full performance level of a group of identical positions was at a higher level and all affected employees were promoted.

Ms. Tines received a temporary promotion to the FG-9 level on 12/20/98 for a period of 120 days while another individual in the Branch was on maternity

Page 6 of 8                                        INITIALS _____ *EP*

leave. None of the other Personnel Assistants who were performing the same functions as Ms. Tines were temporarily promoted to this position.

It is my understanding that Ms. Tines believes she was discriminated against because I requested to have personal interviews with the candidates after having had a panel interview conducted.

Selecting officials have latitude in determining the methods used to fill positions, including whether and how to use interviews. We have used a number of interview approaches in filling positions in the division. We have had situations where there has been no interview panel. We have had situations where there was an interview panel and no additional interviews. There have been situations where I, as the selecting official, have been a member of the interview panel. And there have been situations where there was an interview panel and an additional follow-up interview.

Also, as I mentioned above, I requested the personal interviews so that I could obtain additional information about the candidates beyond what I had already received from the interview panel. The panel interview results indicated that Ms. Tines' responses to some of the questions reflected a degree of rigidity or lack of flexibility. I viewed this additional individual interview as a further opportunity for Ms. Tines to demonstrate the positive characteristics that I was looking for in a candidate for the position. I perceived this as providing Ms. Tines an opportunity rather than taking one away.

It is my understanding that Ms. Tines believes that she has not received promotion and career advancement to the same degree that others in the division have received them. Ms. Tines has received two permanent promotions and two temporary promotions during her tenure in this division.

INITIALS ___*EQ*___

As a manager I am entrusted with balancing and integrating the needs of the organization and the needs of the employees. I believe strongly in the fair and equitable treatment of all employees in this division, and strive to ensure that each employee has an opportunity for development and career progression.

**I HAVE READ THE ABOVE STATEMENT WHICH IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.**

_____        _____
**Ernest J. Landry**                    **Date** 5/9/00

Sworn and subscribed to me this the 5th day of May 2000.

_____        _____
**Maureen Nash-Cole**                   **Date** 5/9/00
**EEO Investigator**

EXHIBIT 17

## UNITED STATES DEPARTMENT OF TRANSPORTATION

## DEPARTMENTAL OFFICE OF CIVIL RIGHTS

# AFFIDAVIT
# DOT 1-00-1160

I, Eileen M. Celli, employed by the Federal Aviation Administration, New England Region, Human Resource Management Division, located at 12 New England Executive Park, Burlington, MA 01803-5299, make the following statement to MAUREEN NASH-COLE, who has identified herself to me as an EEO INVESTIGATOR for the U.S. DEPARTMENT OF TRANSPORTATION, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party.

**I HEREBY SOLEMNLY AFFIRM** that I am a white Caucasian. My immediate supervisor is Susan Nason, and my second-line supervisor is Ernest Landry. I have been employed by the FAA since 1983. I currently hold the position of Personnel Management Specialist, FV-201-13, since March 26, 2000. Prior to that I held the position of PMS, FG-201-12, since 1983.

I was responsible for developing the vacancy announcement ANE-DSS-12247-342 for the position of Personnel Management Specialist (Benefits Administrator), FG-201-7/9/11, HRMD. This position was open to HRMD employees only. The announcement opened on September 10, 1999 and closed on September 20, 1999. This position was established during discussions that Mr. Landry had with Ms. Nason and Ms. Razel. The report that was created by the Design Organizational Team, this was simply a recommendation from the team on how Ernie might want to consider structuring his organization.

Page 1 of 2

INITIALS _____ *m C*

Two (2) HRMD employees applied for the position, Rose Kennedy and Yvonne Tines. A panel met to interview the candidates. The panel included Gina Razel, Utta Carr, and Greg Hollebeke. I have the notes from the panel interviews. I don't know if any further interviews were conducted. I don't remember who suggested who should be on the panel. I did not sit in on the panel interview. In this case, the panel interviewed the candidates and provided the results of the interview to the SO, Ernie Landry.

The next thing that happened that was my responsibility was to keep track of the MPP certificate. I informed Mr. Landry (see attached) that the certificate was going to expire and he asked me to extend it for an additional 90-days, which I did. I then sent him a cc:mail message (see attached) to inform him that the certificate would again be expiring, and he told me verbally that he would not be making a selection. He then signed and dated the certificate. Management has the right to either select or not select, and on occasion management will make the decision to not select.

Shortly after the bid went out on this position, discussions regarding centralizing the benefits functions were occurring. I think the reason he did not want to fill this position was because there was a chance that this may happen. The reason we did extend the certificate was because these discussions were ongoing.

In my opinion, under the recommended structure from the Design Team, which I was a member of, I think that Yvonne thought that one of the positions was designed for her, and expected to be placed in it.

**I HAVE READ THE ABOVE STATEMENT WHICH IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.**
Page 2 of 2                                              INITIALS _Cmc_

_Eileen M. Celli_        _5/8/00_

**Eileen M. Celli**                  **Date**

**Sworn and subscribed to me this the 8th day of May 2000.**

_Maureen Nash-Cole_       _5/8/00_

**Maureen Nash-Cole**           **Date**
**EEO Investigator**

Page 3 of 3                               INITIALS _____

## PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement, or other type of testimony, is derived from one or more of the following:

5 C.F.R. §§ 5.2-5.3; 29 C.F.R. Part 1614; 5, U.S.C. §§ 1303-1304; 42 U.S.C. § 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) compliant of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Failure to furnish the information requested will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Failure to furnish the above requested information by present or prospective Government Contractors, where the contract so provides, may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____
**Witness**

Date:___5/8/00_____

_____
**Maureen Nash-Cole**
**EEO INVESTIGATOR**

Date:___5/8/00_____

EXHIBIT 18

**UNITED STATES DEPARTMENT OF TRANSPORTATION**

**DEPARTMENTAL OFFICE OF CIVIL RIGHTS**

## AFFIDAVIT
## DOT 1-00-1160

I, Susan E. Nason, employed by the Federal Aviation Administration, New England Region, Human Resource Management Division, located at 12 New England Executive Park, Burlington, MA 01803-5299, make the following statement to MAUREEN NASH-COLE, who has identified herself to me as an EEO INVESTIGATOR for the U.S. DEPARTMENT OF TRANSPORTATION, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party.

**I HEREBY SOLEMNLY AFFIRM** that I am a white Caucasian. My immediate supervisor is Ernest Landry, and my second-line supervisor is Mary Ellen Dix. I have been employed by the FAA for approximately eight (8) years. I currently hold the position of Supervisory Personnel Management Specialist, FV-201-J, since March 2000. Prior to this I held the position of Team Leader, FG-201-14, HRMD.

Please explain your working relationship with the Complainant?

I became the Team Leader for the Operations Branch of HR on 5/24/98. Ms. Tines was a member of the Operations Team. As a Team Lead I had the authority to approve leave, distribute and review work, identify problems and issues, recommend training, recommend awards for employees, etc. I had no supervisory responsibility with respect to performance appraisals. However, I gave input to Mr. Landry who was the first line supervisor for my team members.

How long have you been the Complainant's supervisor?

Since March 2000.

Did you have any input into the development of the position Employee Relations Specialist, FG-9/11, whose duties would include Retirement backup, Health, Life

Page 1 of _5_

INITIALS _AEN_

TSP, Leave & Hours, Awards, Benefits, CPMIS, IPPS, that was suggested by the Organizational Design Team on February 4, 1997? Please explain.

Not specifically. The team 's report was presented to the entire HR staff and discussed by all of us. I was not a team lead at that time and was not a member of the Organizational Design Team.

Do you have any knowledge if any of the positions suggested by the Design Team were filled? Please explain.

I don't recall specifically which positions were filled. I would have to look at the report again. I think there were some positions filled.

Did you have any input into the development of the Personnel Management Specialist, FG-201-7/9/11, position that was advertised under vacancy announcement ANE-DSS-99-122-47342? Please explain.

YES. This position was developed to try to reach the recommendation of the Design Team and to meet current needs. By that time, there was more automation of some of the benefits activities through Employee Express and the Health Benefits open season was becoming more automated. My personal concern was that I did not think it was a good idea to take all the benefits functions from the Personnel Assistants positions in ANE-14 so I felt that there needed to be a balance between the new position and the functions performed by the Assistants. There were three PAs, Ms. Tines, Rose Kennedy, and Patti Torrisi. The question was what was our most pressing need, and I saw this need as a backup for retirement. That is what this position would focus on. We (Gina, Ernie, and I) structured the position. There was also some involvement with Larry Piro and Eileen Celli. My recollection is that Larry's involvement was to provide us some input with respect to structuring the benefits functions. Eileen was the classifier for this position. I remember we had a chart and discussed how much time would be spent on specific areas and what levels of responsibilities this position would have. We also discussed the relationship of this position to others, specifically the Personnel Assistant positions.

Were you a member of the interview panel?

NO.

Did you have any meetings with Ernest Landry or Gina Razel to discuss a possible selection for the PMS position? Please explain.

The interview panel gave their information to Mr. Landry, because he was the Selecting Official. We have a meeting every Monday, and I think during one of

INITIALS _____

those meeting he indicated that the two candidates were very close as far as their performance during the interview. These two candidates were Rose Kennedy and Ms. Tines. We discussed about how to proceed from there since the interview did not result in a clear distinction between the two. We talked about different options such as Mr. Landry interviewing the candidates in his role as the SO. Just because there is an interview panel, this does not preclude the SO from conducting a second interview. Making a selection or not making a selection were also discussed. I think at this point, Mr. Landry was not sure what he was going to do.

One of the things that was going on nationally within the ARC (Regional/Center Operations) organization was identification of ways to become more efficient. They were looking at things like centralizing the administration of charge cards as well as centralizing all health benefits functions. Some proposals were dropped, but, as far as I know, the efficiency of centralizing the health benefits functions is still being actively studied and pursued. This possibility was certainly on my mind since it would impact the work of the Personnel Assistants in ANE-14. I'm not sure if this was a consideration for Mr. Landry in connection with filling this particular job, but it was an example of the potential organizational changes occurring in the benefits area.

Did you have any input into the cancellation of the PMS position? Do you know why this position was cancelled? Please explain.

I had no input into this position being cancelled. I believe that Mr. Landry feels that there are so many changes coming along in the benefits area that he did not want to place someone permanently in that job, and then have their functions dissipate. The only thing I remember clearly is that I was still concerned about having a backup for the retirement functions.

I'm sure he told Gina and me that he had decided not to fill the position, and then told the applicants. I know that Ms. Tines was upset because I recall that she came and talked to me. She was disappointed. I believe she did talk about the fact that higher graded positions were being filled, and here was an opportunity for a middle-graded position and that is the only one that didn't get filled. I told her that I could understand how she felt, and encouraged her to speak with Mr. Landry, since he was the SO.

I certainly don't think there was any disparate treatment. From my viewpoint other positions that were filled were filled appropriately. There were, for example, added responsibilities, in the areas of pay and compensation, labor relations, and OWCP. The Personnel Assistant positions were upgraded in September 1999 to FG-08 level to reflect the added complexity and responsibilities of their jobs.

Page 3 of _5_                                                    INITIALS _____

It's my opinion that she was given the same or possibly more opportunities than the other Personnel Assistants. She was given a temporary promotion to the FG-201-9 level when one of the Personnel Management Specialists was on maternity leave. She has received training opportunities from the agency in the past, and has also been given job opportunities such as managing the Leave Donor Program. More recently, she managed the Life Insurance Open Season. I see these as opportunities for developing skills. I also nominated her and she received an award for the work she did on the Life Insurance Open Season.

I believe Mr. Landry's decision to cancel this position was made in the best interest of the organization. I think he could have filled it or not filled it. I think he recognized that the most pressing need was to provide backup for the retirement functions, and he made a decision to make rotational temporary promotions for all of the Personnel Assistants beginning May 7, 2000. This addresses what has been a primary concern of mine all along – backup in the retirement area. I don't believe that cancellation of this position last Fall precludes the possibility of filling this position in the future. Using temporary promotions achieves two objectives – developing several people in retirement knowledge and giving us time to see how the benefits functions may or may not be further changing.

Do you have any further information?

NO.

Do you know anyone that could offer me any further information?

NO.

**I HAVE READ THE ABOVE STATEMENT WHICH IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.**

_Susan E. Nason_                               5/9/00

**Susan E. Nason**                               **Date**

**Sworn and subscribed to me this the 8th day of May 2000.**

Page 4 of _5_                               INITIALS _ELN_

Maureen Nash-Cole
EEO Investigator

Date 5/9/00

INITIALS _____

EXHIBIT 19

**THE COUNSELING CENTER**

December 17, 2002

Mr. Ernest Landry
Division Manager
Federal Aviation Agency

Dear Mr. Landry,

I am the psychiatrist treating Ms. Yvonne Tines-Jones since 1/14/02. Ms. Tines-Jones remains in active treatment and was last evaluated 12/09/02. I recommend strongly that when Ms. Tines-Jones returns to work on 1/6/03 that she be assigned to a difference job site and not to return to work at the FAA regional office in Burlington, MA. Ms. Tines-Jones is being treated for Panic Disorder and Depression, which is exacerbated markedly by an adverse work relationship at the FAA Regional Office in Burlington, MA. Therefore I hope you will grant Ms. Tine-Jones' request to be transferred to a different work site.

Sincerely,

Elizabeth A. Blencowe, MD
Psychiatrist

/ebtines-jones/

One Main Street  •  Nashua, New Hampshire 03064  •  603-883-0005  •  Fax 603-883-0007
814 Elm Street • Manchester, New Hampshire 03101 • 603-627-3111 • Fax 603-883-0007

EXHIBIT 20



# MERRIMACK VALLEY COUNSELING ASSOCIATION

June 12, 2003

*Director*
William B. Flynn, Jr. Ph.D.

*Director of Psychiatry*
Eren Kurtay, M.D.,
Board Certified, N.H.

*Associate Director*
David C. Brower, Ph.D.

*Clinical Director*
Wendy M. Greene, Ph.D.

*Assistant Director*
Thomas P. Lynch, Ph.D.

Office of Personnel Management
PO Box 200
Boyers, PA 16017

Re:   Yvonne Tine-Jones
SSN:   ▓▓▓▓▓▓▓
DOB:  05/21/19▓▓

To Whom it May Concern,

   Yvonne Tine-Jones has been in individual psychotherapy starting January 29, 2002 through the present time. In addition to her on-going psychotherapy sessions, she has been in treatment with her psychiatrist Dr. Elizabeth Blencrowe for medication management.

   Ms. Tine-Jones presented with a Generalized Anxiety Disorder, with acute panic attacks and depressive symptoms. Her disorder is characterized by acute reactive panic attacks precipitated by severe stress at her workplace environment. She has been an employee at the Federal Aviation Administration for fourteen years.

   Starting in 1999, Ms. Tine-Jones has filed three discrimination lawsuits and has been on three disability leave of absences. Her initial leave of absence was from February 10, 2002 to April 1, 2002. It was precipitated by an acute panic attack at work resulting in an emergency room visit. Her second leave was from August 20, 2002 to March 17, 2003. It was precipitated by an acute panic attack and overdose at work, resulting in an overnight hospitalization. On March 17, 2003, she returned to work as required by her employers and subsequently experienced an acute panic attack and she was transferred by ambulance to an emergency room. Ms. Tine-Jones has not returned to work since that time.

   Ms. Tine-Jones has applied for a disability retirement from her job with the FAA. This is an appropriate request as documented by her history and clinical symptoms. Ms. Tine-Jones has a mental disorder that prohibits her from performing useful and efficient service at the FAA.

Sincerely,

*Jessica M. Schwartz, LICSW*

Jessica M. Schwartz, LICSW
Psychotherapist

EXHIBIT 21

United States Department of Transportation
Affidavit

I, **Yvonne Tines Jones, employed by the Federal Aviation Administration
(FAA) at the New England Regional Office at 12 New England Executive Park
in Burlington, Massachusetts, do solemnly swear:**

[Are you still employed by the FAA?] **yes**

[What is your title?] **Staffing Assistant**

[How long have you held this position?] **Since July 2, 1989.**

[In what FAA organization do you work?]
**In the Human Resource Management Division, Operations Branch, ANE-14.**

[Who is your immediate supervisor?] **Susan E.Nason**

[Was Ms. Nason always your immediate supervisor?]
**First, Todd Pearson was my supervisor and then Ernie Landry and then
Susan Nason. She became my supervisor when she started as the Operations
Branch Manager.**

[Who is your second-line supervisor?] **Ernest J. Landry**

[Please describe your disability. Disability is defined as a physical or mental
impairment that substantially limits one or more major life functions.]

**My treating psychiatrist has diagnosed my condition as Depression and Panic
Attacks. I don't know how this limits a major life activity but I do know that
I cannot work directly in that work environment and I cannot work for Susan
Nason.**

[Please describe any mitigating factors employed with reference to your disability.
What are they? What effect do they have? When did you start to employ them?
Have these measures or their effects changed over time?]

[How do you reconcile your psychiatrist's February 21, 2003 statement that you were able to perform your duties and interact with your supervisor and co-workers with having a disability that has symptoms that are heightened by contact with your workplace and supervisor?]

**When you refer back to the medical documentation (refer to Attachment 3) that I had submitted to Susan Nason in the Fall of 2002 (09/20/02; 09/25/02; 11/25/02; 12/17/02 & 12/30/02), my treating psychiatrist and therapist both indicated that a return to that work site and supervisor would not be recommended. In her letter dated 02/21/03 she indicated that I could interact with FAA employees but I would continue to suffer stress if returned to the same work site and supervisor and that a reassignment had been requested.**

[What is your race and color?] **Black**

    I declare under penalty of perjury that the information contained in the forgoing ten (10) pages is true and correct to the best of my knowledge and belief. See USC 1746. I understand that the information I have provided herein is not to be considered confidential and that it may be shown to the interested parties by Agency representatives. However, I also understand that I am not to personal disseminate the information contained in this affidavit as such action could interfere with the processing of the investigation and could violate provisions of the Privacy Act and Agency policies.

**Executed on September  _5_ , 2003.**

_Yvonne L. Sims Jones_
**Affiant's Signature**

_Ismael Y.Y. West_
**Witness Signature**

EXHIBIT 22

# Memorandum

**Subject:**  Request from ANE-14 and the Regional Office
**To:**    Ernest J. Landry, Manager,
       Human Resource Management Division, ANE-10
**From:**  Yvonne L. Tines Jones, Personnel Assistant
**Date:**   01/10/03

---

The purpose of this memorandum is to request a reassignment from the Operations Branch, ANE-14 and the Regional Office located in Burlington, Massachusetts. This is being requested as a reasonable accommodation of my handicapping disability that was recommended by my treating psychiatrist as being medically necessary.

First, I need to address a statement made by the Operations Branch Manger, Susan Nason, in her memorandum to me dated August 27, 2002. In this memorandum, Ms. Nason alleges that on August 19 that I exhibited behaviors which culminated in my collapse on August 20, 2002.

On Monday, August 19, I arrived in the regional office at 6:15 a.m. and remained in my work area until my departure in the early afternoon. Upon my department from the office, I saw Gina Razel and Rita Mahoney at the receptionist area.

1

Ms. Razel asked me if I was okay and I replied " that I had taken some medication which makes me sleepy." Ms. Razel then stated "if I was alright to drive home?" My reply to her was "yes" and proceeded to leave the office.

Upon my arrival at the office the next morning, Tuesday, August 20, I found a note that Ms. Nason had left on my desk. I immediately went to the region's Employee Assistant Manager (EAP), Charlie Pagnini, and explained to Mr. Pagnini that I was not comfortable meeting with Ms. Nason at that time because I believed the meeting would be contentious and I was not emotionally prepared to deal with the situation.

I requested his support in working with Ms. Nason to reschedule the meeting so I would have some time to think through the issues and prepare before the meeting with her. Mr. Pagnini stated that he would speak with Ms. Nason and ask that she move the meeting to another day. Shortly thereafter, Mr. Pagnini informed me that Ms. Nason was insistent upon keeping the meeting as scheduled and I was expected to attend. Ms. Nason came over to me after the weekly staff meeting and asked why I did not attend. I informed Ms. Nason that I was not feeling well. Her response was to reiterate in a very confrontational tone that she expected to see me in the meeting at 1:00 p.m. that day.

At approximately 1:05 p.m., Ms. Nason came to my work area and asked if I was coming to the meeting. I explained to her that I was in the process of preparing a written response to the issues that she raised in her note to me but I did not physically feel up to a face-to-face meeting.

2

*January 10, 2003*

Ms. Nason became belligerent and stated that if I did not attend the meeting that I was committing insubordination. Again, I asked Ms. Nason to reschedule the meeting but she insisted that I would be committing insubordination if I did not attend. I acquiesced; went to the meeting and the stress of this situation caused me to have a severe panic attack that required hospitalization.

It is clear from this incident, among others, that as a manager, Ms. Nason is unable to respond to situations in a manner that offers any consideration to my well being as an employee. Given this and the long history of management issues I have had in the Burlington office, I am requesting a reassignment to either 35 Northeastern Boulevard or 11 Murphy Drive in Nashua, New Hampshire to execute my job responsibilities. I have already provided you with the medical documentation from my treating psychiatrist that will support that this is the best alternative for my return to work. Additional supporting documentation can be provided by my therapist, however, it is my hope this will not be necessary.

I also want to note that I have developed an Individual Development Plan (IDP) to become a Personnel Management Specialist and I fully intend to pursue this career objective into retirement.

*Yvonne L. Tines Jones*
Yvonne L. Tines Jones

EXHIBIT 23



**U.S. Department
of Transportation

Federal Aviation
Administration**

# Memorandum

CONCURRENCES
ROUTING SYMBOL
ANE-14
INITIALS/SIG
DATE
1/31/03
ROUTING SYMBOL
ANE-16
INITIALS/SIG
DATE
1/31/03
ROUTING SYMBOL
ANE-7
INITIALS/SIG
DATE
1/31/03
ROUTING SYMBOL
ANE-10
INITIALS/SIG
DATE
1/31/03
ROUTING SYMBOL
INITIALS/SIG
DATE
ROUTING SYMBOL
INITIALS/SIG
DATE
ROUTING SYMBOL
INITIALS/SIG
DATE
ROUTING SYMBOL
INITIALS/SIG
DATE

Subject:  **ACTION:** Reasonable Accommodation Request        Date:  **January 31, 2003**

From:  Manager, Human Resource Management Division        Reply to
Attn. of:

To:  Yvonne L. Tines Jones

This is in response to your reasonable accommodation request seeking re-assignment to Nashua, NH to execute your job responsibilities as a Personnel Assistant, which you hand delivered to me on January 10, 2003.

I have reviewed the medical documentation submitted to date, in conjunction with the New England Region Flight Surgeon, and am unable to grant your request at this time for the following reasons: a) the documentation is inadequate to establish that you have a disability and b) the documentation is inadequate to establish that you meet the definition of a qualified individual with a disability.

While the medical documentation substantiates that you suffer from a mental impairment, the information is insufficient to demonstrate that your impairment substantially limits a major life activity. As such, your medical condition may not rise to level of a disability that is subject to the accommodation requirement of the Rehabilitation Act of 1973, as amended by the ADA. In order to determine whether your impairment is a disability, we need further medical documentation from your medical provider regarding how your depression and panic disorder limit you in a major life activity(ies).

The medical documentation is also insufficient to determine whether you are a qualified individual with a disability. To determine what limitations your depression and panic disorder impose on your ability to perform the duties of your position or alternate positions I am requesting that you have your medical provider answer the following questions:

1. *How has your Depression and Panic Disorder limited you in your day-to-day activities and daily life?*

2. *What types of work duties are you capable of performing?*

3. *What types of work duties are you incapable of performing?*

4.  *Are you able to interact with your supervisors? If not, please explain*

5.  *Are you able to interact with other FAA employees? If not, please explain.*

Because I'm unable to make a determination on your Reasonable Accommodation request due to insufficient medical documentation, this does not constitute a denial of your Reasonable Accommodation request. If you demonstrate that you are a qualified individual with a disability, I will review your request for accommodation to determine its effectiveness.

As such, please provide the information as soon as possible but no later than February 24, 2003, so I may act upon your request.

If you need clarification of any aspect of this letter or information on the Reasonable Accommodation process please feel free to contact me or Gina Razel at 781-238-7270.

ORIGINAL SIGNED BY

Ernest J. Landry

File:
WP: YTJ ACComodation.doc
ANE-10:EL:RM:781-238-7250:01/28/2003

# EXHIBIT 24



## THE COUNSELING CENTER

February 21, 2003

Mr. Ernest Landry
US Department of Transportation
Federal Aviation Administration

Dear Mr. Landry,

I am the psychiatrist for Ms. Yvonne Tines-Jones with whom I last met on 12/17/02. She has given me your request for more information about the current impact on her functioning of her emotional and psychiatric symptoms and has asked me to write a letter on her behalf in response.

At this point Ms. Yvonne Tines-Jones is able to return to work and perform all of her assigned duties at her work place. Ms. Jones is able to act in a manner appropriate to the work place with other FAA employees and with her supervisors. Her history of depression and panic disorder have improved and although she still feels considerable stress at the prospect of returning to the same work site with her previous female supervisor. She still hopes to be reassigned to a different work site. Ms. Tines-Jones' emotional symptoms are much improved when she is not immediately involved with her previous female supervisor. Ms. Tines-Jones will remain in outpatient psychiatric care with psychotherapy and with her current medications, which she has found helpful.

Sincerely,

Elizabeth A. Blencowe, MD
Psychiatrist

/ebyvonnejones/

EXHIBIT 25

---

## UNITED STATES DEPARTMENT OF TRANSPORTATION

## DEPARTMENTAL OFFICE OF CIVIL RIGHTS

---

# AFFIDAVIT

DOT Complaint No.: 1-00-1160

I, Yvonne L. Tines Jones, employed by the Federal Aviation Administration, New England Region, Human Resource Management Division (HRMD), located at 12 New England Executive Park, Burlington, MA 01803-5299, make the following statement to MAUREEN NASH-COLE, who has identified herself to me as an EEO INVESTIGATOR for the U.S. DEPARTMENT OF TRANSPORTATION, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party.

I HEREBY SOLEMNLY SWEAR that I am a black African-American. My immediate supervisor is Susan Nason (as of March 26, 2000, prior to that she was my Team Leader), and my second-line supervisor is Ernie Landry. I have been employed by the FAA since January 3, 1989. I currently hold the position of Staffing Assistant, FG-0203-08, since September 26, 1999. Prior to this I held the position of Personnel Assistant, FG-203-07 in HRMD.

The bid for the position of Personnel Management Specialist, FG-201-7/9/11, came out on September 10, 1999. I applied for the position under vacancy announcement ANE-DSS-99-122-47342. On September 24, 1999, Mr. Landry informed myself, Rose Kennedy (white Caucasian), and Patti Torrisi (white Caucasian) of his intention of giving us all a promotion to the position of Staffing Assistant, FG-08, effective September 26, 1999. He stated that this was because we were doing more work, but I believe that the reason he did this was because I alleged in my first complaint (DOT 1-99-1077) that I was being treated differently than my white co-workers. They had only been employed with the

Page 1 of _8_                                    INITIALS _____

agency for one (1) year and I had been here eight (8) years. Ms. Kennedy and Ms. Torrisi only process personnel actions for their lines of business, and I have to manage other programs such as the Stay-In-School, Leave Donor/other leave programs, and Summer/Temp Program.   I definitely have more responsibility than they have.  An example of how I have been treated differently than fellow white co-workers, is that anytime I have asked for a promotion, someone else always gets promotion along with me, always someone a white Caucasian.  Back in 1995, when Kerry Ferreira left to have a baby, I was working with Linda McConney-Rico on an accretion of duties personnel action for a promotion to the seven (7) level, everything was in place and we were waiting for Mr. Landry to sign it when we learned that Ms. Ferreira was returning to work.  I was told at that time by Eileen Celli (white Caucasian) that I wasn't doing six (6) level work, I was doing five (5).  I think because Kerry was returning Mr. Landry didn't want to promote me and not Kerry.    When that happened, Ms. McConney-Rico encouraged me to file an EEO complaint, because she said that this was not fair treatment.  I decided I did not want to do that at that time, because I prayed about it and God told me to just wait.  In July 1997, both Kerry and I received promotions to the seven (7) level.

On September 27, 1999, I confirmed my interview for the position I applied for with Gina Razel.  It was scheduled for September 28, 1999, at 10:30 a.m.  On the morning of September 28, 1999, I received a call from Katrina Newlin that there was a power outage in our building and it wasn't scheduled to be open until 10:00 a.m. I had a doctor's appointment that morning, and when I arrived at 8:30 a.m. everything had been corrected.  Sometime after 10:00 a.m., Ms. Razel came to me and said that she would come to get me when the panel was ready.  She did not come to get me until 11:40 a.m.  She gave me no reason for the delay.  Rose did not come in that day, and I believed she was scheduled for an interview also.   I learned later that she had spoken to Ms. Razel and

Page 2 of _8_

INITIALS _____

rescheduled her interview for the following day. I was never offered the opportunity to reschedule my interview.

I was interviewed by a panel that included Ms. Razel as the Lead, Utta Carr, and Greg Hollebeke, they are all white Caucasian. During the interview I noticed that it wasn't very friendly. No one tried to make me feel comfortable at all. There were ten (10) questions that were asked and each person got a chance to ask a question. I was able to write down each question, and I could ask to have it repeated but could not asked for any clarification at all. There was one question that I said had a possibility of two answers, and I said I would come back to it. We continued on and when we got to question ten (10), Ms. Razel was closing the interview, and I said to her I still have one question to answer. That's when Mr. Hollebeke leaned back in his chair, and said sarcastically, I thought you forgot, he was saying it in a mean way. While they were going back to the question I made a comment, "Can somebody smile, I know everyone in this room", that is when Utta laughed and said "Oh, your trying to make us feel comfortable." Despite having what I considered a very unfriendly interview, I thought I did very well and was pleased.

On October 1, 1999, I was approached by the Administrative Officer, Linda Cucchiara, that Mr. Landry and Ms. Razel wanted to have a second interview. There was no mention of a second interview during the panel interview, and I also said to her that I felt as if I was being treated differently than other people who had applied for positions, because they only had to do a panel interview not a second interview. It was also on that day that another employee told me that she saw Rose Kennedy in the Ladies Room on September 29, 1999, crying, and when she asked why, Rose said that she had her interview and didn't think she did well. That led me to the conclusion that they were trying to give Rose another opportunity at an interview. Mr. Landry came to me later than day, and said he wanted to have a second interview, and when I asked him why, he stated

Page 3 of 8                                                    INITIALS _____

that he needed more information. He did not detail what type of information he needed. I told him I would let him know. I called an attorney at that point and they advised me to do the second interview. The interview was scheduled for Monday, October 4, 1999 at 11:00 a.m. On October 4, 1999, I was sick and did not come in. I was getting married on October 10, 1999 and was scheduled for leave from October 5, 1999 until October 15, 1999. I was very upset about having to be interviewed for a second time, because again this is another example of how I am treated differently than other employees. It was very stressful for me. I felt that they knew I was getting married, and this was just adding more stress on me. I do want to note that Mr. Landry was invited to my wedding, but did not attend. In the past he had attended the weddings of other co-workers (Cheryl Johnson (white Caucasian) and Kerry Ferreira (white Caucasian).

During this time Rose Kennedy was pregnant and went out on maternity leave in November 1999 and not returning until I think February 2000. I thought that this was another reason why they were not making a decision, that they were waiting for her to return.

On October 27, 1999, I met with an EAP counselor and told him I was having trouble sleeping, and also having nightmares. He said it was probably stress related, that was brought on by the situation at work. I had already filed my discrimination complaint.

On December 22, 1999, I went to Eileen Celli trying to ascertain what the status of filling the position I had applied for. She said she did not know, and she said she was going to check. She came back later that afternoon and told me that Mr. Landry and Ms. Razel had decided to extend the certificate for an additional 90-days.

Page 4 of _6_                                                    INITIALS _____

During this timeframe I met with the EAP counselor and he couldn't help me, it was beyond his scope. He referred me to a psychologist. I saw her on December 9, 1999, and she wrote a report stating that I was under considerable stress.

On March 16, 2000, we were in a Team Meeting and we were in the process of being straight-lined to Washington (this meant that HRMD no longer reports to the Regional Administrator, but directly to HR in Washington). I asked Ms. Nason if this was going to have an effect on filling the position, and she said that Mr. Landry had not made a decision, possibly because Health Benefits might be centralized. I said to her that Health Benefits was only a portion of the job and that was no reason not to fill the job, and she said it was up to Ernie if the job would be filled or not.

Later on that afternoon Ernie asked Rose and I to come into his office, and he said that he was going to cancel the advertised job. He said that he had received some information from one of the national work groups that he was on, that there was a possibility that benefits and retirement functions may be centralized in the future, and therefore he did not want to put someone permanently in the job, and later on they would not have a job to do. He stated that he realized how disappointed we were, but it was his decision not to fill the job. He then said that he was going to allow us to serve a 90-day temporary promotion, beginning with myself, then Rose, and was also going to afford the opportunity to Patti Torrisi to do the same. I told him that I had concerns that he was allowing Patti the opportunity for a temporary promotion when she did not compete for the position. I also told him that by doing this he was not allowing me the opportunity for a permanent promotion. He also made a statement that my temporary promotion would take place after the Core Compensation conversion, which meant that I would be losing money. If he had given me the promotion prior to the conversion, I would have had an opportunity to make more

Page 5 of __6__                                               INITIALS _____

money. When the two white employees (Eileen Celli and Carol Doyle) were promoted, management did not ensure parody for me with respect to equal pay

I do recall back in 1995, that there were discussions regarding removing the OWCP functions that Carol Doyle (white Caucasian) was responsible for. In spite of this she received a promotion to the GS-09 level, and in 1998 she received her 11, and at the present time she is a 12. I see this as a similar situation that I am in. Mr. Landry told me he couldn't put anyone in that position because the functions may be removed, but yet Ms. Doyle was allowed to stay in her position and continued to receive promotions.

Following my meeting with Mr. Landry I was out on sick leave the following day, March 17, 2000, because I was so upset by the news. On March 27, 2000, I met with a counselor who confirmed that I was suffering from depression. I also met with him on March 29, 2000, he suggested I make an appointment for a physical, which I did have on April 3, 2000. At that time, my physician prescribed an anti-depressant to help me sleep, which I still take now.

During an all hands meeting on March 23, 2000, Mr. Landry announced that Eileen Celli (white Caucasian) was receiving a promotion to a FG-13 effective March 26, 2000, due to her work on Core Compensation. He was promoting her prior to the Core Compensation going into effect on April 23, 2000. He also promoted Carol Doyle (white Caucasian) to a FG-12, due to her work on the national panel for OWCP, effective March 26, 2000. He also announced that he was canceling the position I applied for, and then said that he was allowing us to serve 120-day temporary promotion as a FG-9, PMS, and that I would be first.

On March 27, 2000, Ms. Nason approached me and asked if I would like to go to the training benefits conference being held June 5 to 9, 2000, in Norfolk, VA. Last year when Larry Piro went to this they were calling it a conference, now

Page 6 of  $\underline{8}$                                                                INITIALS $\underline{\mathcal{LDf}}$

they are calling it training. We had another benefits telecon on April 13, 2000, this time they said there was not central funding available for the conference except for one headquarters person and one Eastern Region person. If the Regions wanted to send a representative, they would be responsible for payment. On April 17, 2000, I sent Ms. Nason a message saying that I would be interested in attending the conference. On April 18, 2000, we had a staff meeting and Mr. Landry mentioned the upcoming benefits training conference, he reiterated that there was no central funding this year. Utta Carr (white Caucasian) expressed that she was interested in attending, and he said we'll see. To date, no one has spoken to me to let me know if I am attending or not.

In my opinion Management has a systematic pattern of demonstrating extraordinary measures to insure that white employees have an opportunity for advancement and to increase there income. For example, Gina Razel (white Caucasian), was temporarily appointed to the grade 14 and was made permanent by an announcement. Michele Prebble (white Caucasian) was temporarily promoted to a grade 13 and was made permanent by a Consolidated Personnel Management Information System (CPMIS) pull. Carol Doyle (white Caucasian) was first detailed to a grade 11 for a period of time, and then temporarily promoted to the grade 11 by accretion of duties. Susan Nason (white Caucasian) was permanently promoted to a grade 14 by an announcement. The area of consideration for both Nason and Razels positions was narrowed to the Regional Staff and Support Team (RSST) organizations. Donna Fasulo (white Caucasian), received her promotion under CPMIS pull.

When they discussed advertising the position I was interested in (PMS 9/11), the area of consideration that they wanted to advertise to was all federal employees within the local commuting area. The only reason I think they changed the area of consideration when they finally announced the position was because I had filed a formal EEO complaint, and stated that I was not being treated the same

Page 7 of 9 ___    INITIALS ___

as white co-workers. I had received a temporary promotion to the grade 9 level when Cheryl Johnson (white Caucasian) was out on maternity leave, but had to return to the 7 when she returned.

There is also a consistent pattern of unwillingness to considered and act upon the opportunity for me to advance without feeling compelled to do a similar action for a white employee. Examples are stated above.

**I HAVE READ THE ABOVE STATEMENT WHICH IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.**

_Yvonne L. Tines Jones_   _05/05/2000_
Yvonne L. Tines       Date

**Sworn and subscribed to me this the 4th day of May 2000.**

_Maureen Nash-Cole_    _5/5/00_
Maureen Nash-Cole     Date
**EEO Investigator**

Page 8 of _8_         INITIALS _UQ_

EXHIBIT 26

Discussed this request with Yvonne on 11/1. agreed to move the door
Yvonne agreed. I indicated I did not believe that person N. Was
monitoring Yvonne's activities but rather, just looking by to
to notice if Yvonne was there.

---

Subject:   **ACTION**: Request for relocation of work space          Date:   November 17, 1997

From:   Personnel Assistant, ANE-14A

Reply to
Attn. of:   Yvonne L. Tines:
781-238-7286
FAX:781-238-7253

To:   Ernest J. Landry, Manager, ANE-10

When Crystal Blue left the office, you wanted me to be closer to Kerry and Cheryl so that they could help assist in my development in processing personnel actions. At that meeting I stated that I did not feel comfortable working across from Susan Nason. The reason for this uncomfortableness was due to the fact that she was constantly watching and looking into my work space. I have spoken with in her the past regarding this behavior and have asked her to reframe from doing this but it has continued.

In keeping with the Model Work Environment Employee Roles and Responsibilities as to the following: work together harmoniously and effectively; do not tolerate those who create, foster, or condone an intimidating, hostile, offensive, or abusive work environment, seek productive and efficient solutions to everyday problems that do not compromise the integrity of co-workers and be responsible for your own actions, I feel that I that I am being harassed by this employee. This employee does not have the right to continuously watch me or give the appearance that I am being watched. I can longer work effectively and do not feel comfortable working in this area.

Therefore, I would like to request a change of work location to the area that Carole Doyle is presently occupying after the construction has taken place.

Yvonne L. Tines

File:
WP:  C:\MSOFFICE\WINWORD\DOCS\WKSPACE.MEM

ANE-14A:Y. Tines:ylt:781-238-7286:11/17/97